**UNITED STATES of America, Plaintiff,**

v.

**Douglas O. RUEDLINGER, Defendant.**

No. 96–40045–01–SAC.

United States District Court,
D. Kansas.

July 15, 1997.

Richard F. Hayse, Morris, Laing, Evans, Brock & Kennedy, Chtd., Topeka, KS, for Gregory L. Smart.

James M. Yeretsky, Yeretsky & Maher, LLC, Kansas City, MO, Douglas O. Ruedlinger, New Smyrna Beach, FL, Jacqueline A. Cook, Stites, Hopkins, Fair & Riederer, Kansas City, MO, for Douglas O. Ruedlinger.

Richard L. Hathaway, Office of the U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

On March 10, 1997, trial in this case commenced.[1] The second superseding indictment in this case charged Douglas O. Ruedlinger with ten counts of mail fraud, two counts of wire fraud and five counts of money laundering. An eighteenth count seeking forfeiture of certain assets pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853 was bifurcated prior to trial. On April 7, 1997, the jury returned a verdict finding the defendant, Douglas O. Ruedlinger, guilty of all ten counts of mail fraud, both counts of wire fraud and one count of money laundering (Count 17). A copy of the jury's verdict is attached to this memorandum and order.

This case comes before the court upon Ruedlinger's "Motion for Judgment of Acquittal and/or New Trial" (Dk. 127).[2] Ruedlinger's motion primarily challenges the sufficiency of the evidence. Ruedlinger contends, *inter alia,* that he must be innocent, as FAA members lost no money from their participation in the Partners in Protection ("PIP") agreement. In regard to the money laundering conviction, Ruedlinger contends it must be set aside under the Tenth Circuit's decision in *United States v. Johnson,* 971 F.2d 562 (10th Cir.1992) and its progeny. In addition, Ruedlinger alleges that several specific errors deprived him of a fair trial.

The government responds, arguing that the evidence overwhelmingly supports the jury's verdict in this case. The government contends that evidence of Ruedlinger's knowing participation in a scheme to defraud—a scheme that enabled him to live an extravagant and lavish lifestyle—was proven by the testimony of several witnesses. In short, the government contends that the evidence made it absolutely clear that despite the fact that Ruedlinger knew that no reserves existed, he continued to inform high school athletic associations who had entered the PIP agreement that their $1.6 million in financial reserves existed and were safely deposited in money market certificates as required by the terms of the agreement. In regard to the trial errors alleged by Ruedlinger, the government contends that no errors occurred and that he received a fair trial.

Although the court did not set a time for filing a reply brief, on June 6, 1997, Ruedlinger filed a pleading titled "Defendant's Reply to Opposition of the Government to the Defendant's Motion for Judgment of Acquittal and/or New Trial." (Dk. 144). In his reply, Ruedlinger suggests that the government's brief "takes wide latitude with numerous facts and/or evidence presented to the Court during the trial in reaching its assertion of 'overwhelming evidence.'" Ruedlinger again points to the final audit of FAA which showed a negative reserve balance for the member associations. Ruedlinger also attempts to distance himself from the persons "actually" responsible for the purported misrepresentations. Ruedlinger again argues that he reasonably relied upon the glowing assurances from the persons actually running his companies that everything was being managed in a proper and lawful manner.

The court, having considered the briefs of counsel, the evidence presented at trial and the applicable law, denies the defendant's motion. The court will address the defendant's arguments *seriatim.*

### Sufficiency of the Evidence

■ To review the sufficiency of the evidence supporting a criminal conviction, the court must examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Miller,* 987 F.2d 1462, 1464 (10th Cir.1993). In reviewing the sufficiency of the

---

**1.** Ruedlinger still faces trial in *United States v. Ruedlinger,* No. 97–40012–01–RDR, a case assigned to United States District Judge Rogers. *See United States v. Ruedlinger,* No. 96–40045–01–SAC, 1997 WL 109974 (D.Kan. Feb. 24, 1997) (denying defendant's motion for continuance in light of indictment in second case).

**2.** The defendant's motions for judgment of acquittal at the close of the government's case and at the close of evidence were each denied.

On April 11, 1997, the court granted Ruedlinger's request for additional time to file a motion for judgment of acquittal and/or new trial. *See* (Dk. 119).

evidence, the court must consider both direct and circumstantial evidence, as well as reasonable inferences to be drawn from that evidence. *United States v. Davis,* 1 F.3d 1014, 1017 (10th Cir.1993) (citing *United States v. Fox,* 902 F.2d 1508, 1513 (10th Cir.), *cert. denied,* 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990)).

" 'A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such a finding is infirm because it is not based on the evidence.' " *United States v. Jones,* 49 F.3d 628, 633 (10th Cir.1995) (quoting *Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 521 (10th Cir.1987) (quoting *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1326 (11th Cir.1982))).

The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow from a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts.

*Jones,* 49 F.3d at 632 (quoting *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 895 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208, (1981)). "Additionally, 'the essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.' " *Jones,* 49 F.3d at 632 (quoting *Galloway v. United States,* 319 U.S. 372, 395, 63 S.Ct. 1077, 1089–90, 87 L.Ed. 1458 (1943)).

The court must accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses. *Davis,* 1 F.3d at 1017 (citing *United States v. Youngpeter,* 986 F.2d 349, 352 (10th Cir.1993)).

### Standards for Motion for New Trial

A court may grant the defendant a new trial "if required in the interest of justice." Fed.R.Crim.P. 33. Courts view motions for new trial with disfavor and grant them only with great caution. *United States v. Chatman,* 994 F.2d 1510, 1518 (10th Cir.), *cert. denied,* 510 U.S. 883, 114 S.Ct. 230, 126 L.Ed.2d 185 (1993); *United States v. Leeseberg,* 767 F.Supp. 1091, 1093 (D.Kan.1991). The defendant has the burden of proving the necessity of a new trial. *United States v. Davis,* 15 F.3d 526, 531 (6th Cir.1994); *United States v. Cooley,* 787 F.Supp. 977, 984 (D.Kan.1992), *vacated in part on other grounds,* 1 F.3d 985 (10th Cir.1993). For purposes of this case, the relevant rule is that a new trial should be granted upon "[a]ny error of sufficient magnitude to require reversal on appeal." 3 Charles A. Wright, *Federal Practice and Procedure* § 556 (1982); *see United States v. Stiner,* 765 F.Supp. 663, 664 (D.Kan.1991), *aff'd,* 952 F.2d 1401 (10th Cir.1992) (Table); *United States v. Suntar Roofing, Inc.,* 709 F.Supp. 1526, 1530 (D.Kan.1989), *aff'd,* 897 F.2d 469 (10th Cir.1990). The decision of whether or not to grant a new trial is committed to the sound discretion of the district court. *See United States v. Patterson,* 41 F.3d 577, 579 (10th Cir.1994).

### Overview

Although this court has handled criminal matters involving as many as 81 counts, this was one of the most complex criminal cases this court has heard. This complexity was due in part to the fact that the second superseding indictment alleged a scheme to defraud spanning almost a decade in time. Despite this general observation, the court believes that the jury's verdict is supported by sufficient evidence and that none of the errors alleged by Ruedlinger deprived him of a fair trial.

Before turning to the arguments of the parties, the court will briefly comment on the conduct of counsel during trial. Counsel for both the government and the defendant were extremely well prepared. Although a large number of bench conferences were held during trial, the complexity of this case and the pendency of the second case justified most of those discussions. Counsel for the government presented a mass of evidence regarding the defendant's activities in an efficient and

intelligible manner.[3] Counsel for the defendant zealously represented the interests of his client in a very professional manner. Both counsel are to be commended for their conduct during this trial. The court attributes the jury's verdicts of guilty to the substantial weight of the evidence against the defendant and not any deficiency in his counsel's performance.

### Second Superseding Indictment

In relevant part, the second superseding indictment substantially states:

## INTRODUCTION

That at all times material to this indictment:

1. The defendant **DOUGLAS O. RUEDLINGER,** transacted business within the state of Kansas as and through Wheatland Group Holdings, Inc. ("WGHI"), and his affiliated subsidiary companies; including, but not limited to, Fund Administrators Association,. Inc. ("FAA"), of Topeka, Kansas. **RUEDLINGER** owned 100% of the stock of WGHI. In turn, WGHI owned 100% of the stock of the affiliated companies domiciled in the state of Kansas.

2. **RUEDLINGER** agreed to administer a program called Partners in Protection Program ("PIP") through his company, FAA. This program was devised and promoted to state school activities associations by **RUEDLINGER** as a means of providing liability protection for the school associations. Any school activities association, such as the Kansas State High School Activities Association, participating in this program, was required to make an annual deposit to **RUEDLINGER,** the administrator of the PIP Program. **RUEDLINGER** was entitled to 25% of the deposit as a administrator's fee, and the balance of the deposit, after deduction of insurance costs, was to be held in trust by **RUEDLINGER,** as a reserve against the payment of claims on behalf of the FAA members. **RUEDLINGER** agreed to hold and invest reserves in."money market instruments" and all interest earned from this investment was to be credited to each member's reserve account on a pro rata basis.

## THE SCHEME

3. Commencing in or about 1984, the exact date being unknown to the grand jury, and continuing until 1993, in the District of Kansas and elsewhere, **DOUGLAS O. RUEDLINGER,** did devise, and intend to devise and participate in a scheme and artifice to defraud state school activities associations of money, funds, and credits that consisted of reserves that **DOUGLAS O. RUEDLINGER** had agreed to hold and invest on behalf of the school activities associations.

4. It was part of said scheme and artifice to defraud that **RUEDLINGER** represented or caused to be represented to participating state school activities associations that the balance of annual deposits, submitted by member associations, would be held in reserves and invested in money market instruments, with all interest credited to the associations' reserve accounts on a pro rata basis.

5. It was a part of said scheme and artifice to defraud that **RUEDLINGER** caused annual deposits of state school activities associations, to be commingled with operating funds and monies of all **RUEDLINGER** operations, and used for his own personal use and benefit, including, but not limited to: the payment of operating expenses of all **RUEDLINGER** companies; **RUEDLINGER'S** annual salary of $600,000 to $1,400,000; and, acquisition, improvement and maintenance of a jet airplane, a horse farm in Florida, condominiums in Florida and Vermont, and a residence in Florida appraised in excess of $2,000,000.00.

6. It was part of said scheme and artifice to defraud that **RUEDLINGER** would prepare, or cause to be prepared, spreadsheets that were presented annually to members of the board of FAA which falsely represented that there were positive reserve accounts for most member associations, when in truth and

---

**3.** In this same vein, the court notes that the government's use of the computer and data projector during trial speeded and simplified the presentation of evidence in this document intense case. Both the government and the defendant were able to use the equipment during their examination of witnesses and presentation of evidence.

in fact as **RUEDLINGER** well knew, no such funded reserves existed.

7. It was a part of said scheme and artifice to defraud that **RUEDLINGER** would use, or cause to be used, the United States Mail to send to member associations, Reserve Statements, that would falsely represent to most member associations that they had positive reserve balances on account, and that interest had been credited to these reserves, when in truth and in fact as **RUEDLINGER** well knew, no funded reserves existed, and therefore no interest had been earned.

8. It was a part of said scheme and artifice to defraud that **RUEDLINGER** would use the mail and interstate telephone communications, to falsely represent to FAA members, and their lawful representatives, that the reserve balances were growing, and that reserve balances were in banks, but that he could not disclose the whereabouts of the banks, because of pending litigation; when in truth and in fact, as **RUEDLINGER** well knew, no funded reserves existed.

9. It was part of said scheme and artifice to defraud that **RUEDLINGER** falsely represented to the board of FAA, Inc., that he would provide to them a "certified bank statement" at their July 1992 meeting, showing that the reserve balances were in banks, when in truth and in fact as the defendant well knew, he intended to dissolve FAA prior to the meeting.

10. It was a part of said scheme and artifice to defraud that **RUEDLINGER**, as part of an effort to conceal the fact that reserves did not exist, and make the PIP program appear to be operating as promised, operated or caused to be operated a "Ponzi" scheme, where claims and obligations for PIP were paid out of incoming premiums of FAA members, as well as other insurance products sold by **RUEDLINGER.**

*MAIL FRAUD IN VIOLATION*
*OF TITLE 18 UNITED STATE*
*CODE, SECTIONS 2 & 1341*

11. Having devised the aforesaid scheme and artifice to defraud, set forth in paragraphs 3 through 10, the defendant,

**DOUGLAS O. RUEDLINGER**

for the purpose of executing the aforesaid scheme and artifice, and attempting so to do, knowingly caused to be delivered, from and to the District of Kansas, and elsewhere, by the United States Postal Service, according to the instructions thereon, letters which contained the following:

| Count | Date Mailed On or About | Document | Recipient |
|---|---|---|---|
| 1 | 07/16/91 | 6/30/91 Kansas Reserve Statements | Kansas State High School Activities Ass'n |
| 2 | 07/16/91 | 6/30/91 Oklahoma Reserve Statements | Oklahoma Secondary School Activities Ass'n |
| 3 | 07/16/91 | 6/30/91 National Federation Reserve Statements | National Federation of State High School Ass'ns |
| 4 | 07/16/91 | 6/30/91 Washington Reserve Statements | Washington Interscholastic Activities Ass'n |
| 5 | 06/11/92 | Doug Ruedlinger memo to Nelson Hartman | Kansas State High School Activities Ass'n |
| 6 | 06/10/92 | Doug Ruedlinger memo to The Fund Board | Nelson Hartman |
| 7 | 07/10/92 | 6/30/92 Kansas State High School Activities Ass'n Reserve Statements | Kansas State High School Activities Ass'n |
| 8 | 07/10/92 | 6/30/92 Nat'l Federation of State High School Ass'ns Reserve Statements | National Federation of State High School Activities Ass'ns |

| Count | Date Mailed On or About | Document | | Recipient |
|-------|-------------------------|----------|--|-----------|
| 9 | 07/10/92 | 6/30/92 Oklahoma Statement | Reserve | Oklahoma Secondary School Activities Ass'n |
| 10 | 07/10/92 | 6/30/92 Washington Statements | Reserve | Washington Interscholastic Activities Ass'n |

*WIRE FRAUD IN VIOLATION OF TITLE 18 UNITED STATES CODE, SECTIONS 2 & 1343*

12. Having devised the aforesaid scheme and artifice to defraud, set forth in paragraphs 3 through 10, the defendant

## DOUGLAS O. RUEDLINGER

for the purpose of executing the aforesaid scheme and artifice, and attempting so to do, knowingly caused to be transmitted by means of wire, radio or television communication in interstate commerce, in Kansas and elsewhere, certain signs, signals, pictures or sounds, to wit: interstate telephone communications as follows:

| COUNT | DATE | COMMUNICATION | PARTICIPANTS |
|-------|------|---------------|--------------|
| 11 | 06/05/92 | interstate telephone | Douglas O. Ruedlinger Richard Neal Tommy Henry Bernie Saggau Nelson Hartman Lamar Cole Clarke Coover Dan Freund Gina Chappell |
| 12 | 06/10/92 | interstate telephone | Douglas O. Ruedlinger Randall Forbes |

*ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY IN VIOLATION OF TITLE 18 UNITED STATES CODE, SECTIONS 2 & 1957*

13. On or about the dates set forth below, in the District of Kansas and elsewhere, the defendant,

## DOUGLAS O. RUEDLINGER

did knowingly and wilfully engage and attempt to engage in a monetary transaction, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit of funds in, or the transfer of funds to, a federally insured financial institution, such property having been derived from the specified unlawful activity of mail and wire fraud in violation of Title 18 United States Code, Sections 1341 and 1343, as follows:

| Count | Deposit/Transfer Date On or About | Payor | Amount | Deposit Location |
|-------|-----------------------------------|-------|--------|------------------|
| 13 | 06/26/91 (deposit) | Kansas State High School Activities Assn | $ 14,455.95 | Merchants Nat'l Bank, Topeka, KS (MNB) 074–330 |
| 14 | 10/31/91 (deposit) | National Federation of State High School Ass'ns | $214,224.00 | MNB 074–330 |
| 15 | 06/25/91 (deposit) | Oklahoma Secondary School Activities Ass'n | $ 17,815.66 | MNB 074–330 |
| 16 | 07/24/91 (deposit) | Washington Interscholastic Activities Ass'n | $ 21,717.89 | MNB 074–330 |
| 17 | 09/01/92 (transfer) | Washington Interscholastic Activities Ass'n | $ 15,257.52 | SunBank, Daytona Beach, FL 0546055905738 |

### Evidence Introduced at Trial

During its case-in-chief, the government presented 18 witnesses and introduced 76 exhibits. The defendant called 5 witnesses and introduced 67 exhibits.

The following is a summary of the evidence introduced at trial, viewed in the light most favorable to the government. Doug Ruedlinger was engaged in the insurance business for over thirty years. Ruedlinger apparently entered the field selling, *inter alia*, insurance to high schools and high school athletic associations. Undoubtedly, Ruedlinger carved out a substantial niche in the "student athlete" market. Across time Ruedlinger's market grew, apparently selling a wide variety of types of insurance to high schools and high school athletic associations across the United States. In a brochure titled "the Ruedlinger Companies" Ruedlinger claims that his company's innovations "helped us grow from a small, one-man insurance agency to a multi-million dollar corporation, boasting the largest student and athletic insurance business in the United States, providing a full range of insurance services to customers throughout the United States." *See* Government Exhibit #19 at 1. In addition to providing liability insurance for organizations such as school districts and athletic associations, Ruedlinger's companies offered accident and life insurance to student athletes and cheerleaders.

During most of the relevant time frame, Ruedlinger transacted business within the state of Kansas through the Wheatland Group Holdings, Inc. (WGHI), and his affiliated subsidiary companies which included Doug Ruedlinger, Inc. (DRI) and Fund Administrators Association, Inc. (FAA), of Topeka, Kansas. Ruedlinger owned 100% of the stock of WGHI. In turn, WGHI owned 100% of the stock of the affiliated companies domiciled in the state of Kansas. For simplicity, when referring to all of Ruedlinger's companies in the collective, the court will generally describe them as DRI.

In addition to the typical coverage generally offered by insurance companies, Ruedlinger's companies also supplied "hard to find" insurance to high schools and high school athletic associations. In the 1970's, based upon the substantial rise in student athlete tort litigation, insurance premiums for liability insurance [4] for high school athletic associations skyrocketed. At some point in time, many athletic associations were unable to obtain liability insurance at any cost. Apparently sensing an opportunity to fill that gap in the insurance market, Ruedlinger proposed the formation of the Partners in Protection (PIP) program. PIP was administered under the FAA. The PIP program was essentially a self-insured pooling agreement. In return for their initial deposit and continued participation in the program, member high school associations were able to build reserves for possible future losses and to distribute the risk among the other members. Annual contributions were based upon a complicated formula.[5] In large part, the annual contribution that a member was required to make was based upon the amount of any claims made by that member against the pool.

Money that was paid under the PIP agreement was divided as follows: The first 25% off the top was given to the administrator, DRI, as a service fee. The next portion of the money went to cover the cost of purchasing liability reinsurance. An additional amount went to the purchase of excess insurance. Funds deposited were used to pay actual claims and related expenses. Any remainder was added to each member's reserve. According to the terms of the PIP agreement, reserve funds were to be placed in interest bearing money market certificates. Members of the program that submitted substantial claims could actually have negative balances, requiring a member to repay the negative sum across time. Several members of the program did have negative reserve balances.[6] However, most members

---

4. The insurance sought by high school athletic associations included liability coverage for referees and liability coverage for accidents and injuries at sporting events, such as insurance for injuries caused to either participants or spectators by an errant javelin throw at a track and field meet.

5. During his case, Ruedlinger introduced a videotape production titled "Practices and Proce-

dures of the Partners in Protection Risk Management Program" (Defendant's Exhibit 168). The videotape was prepared by DRI to explain the manner in which the PIP program, and in particular the PIP formula, operated.

6. Some members of the program, such as the California State High School Athletic Association, after racking up a substantial negative balance, simply walked away from their contractual

of the program enjoyed positive reserve balances and the pool as a whole had a positive reserve balance.

FAA's board of directors was comprised of the heads of sections of the state high school athletic associations. Each year, the FAA board of directors and members of the PIP program would receive annual reports which summarized each member's beginning reserve, deposits, fees, interest earned, FAA expense allocation, claims pooled, reinsurance assessment, additional insurance fees, reserve balances and net balances for each association and the pool as a whole. For example, the June 30, 1992, annual report (Government's Exhibit # 18A) showed a "Total Positive Reserve Balances" for all member associations in the amount of $1,955,419.08, adding back "Negative Reserve Balances" of $326,054.76, for a net amount of $1,629,364.20. Annual reports were sent through the United States mails to member associations.

In 1990–91, DRI had gross revenue of approximately $35 million. All American Life Insurance Company accounted for the majority of DRI's annual revenue. All American underwrote DRI's student insurance business. FAA, the primary subject of the second superseding indictment, was only a small portion of DRI's total business, representing less than five percent of DRI's annual gross revenue. Because most of DRI's revenue was derived from school related activities, the vast majority of its income would be earned in the months of August, September and October, coinciding with the beginning of each school year.

Ruedlinger is a person accustomed to a lavish lifestyle. Evidence of Ruedlinger's affluent lifestyle was directly relevant to spe-cific charges in paragraph five of the second superseding indictment which alleged that Ruedlinger had converted the funds intrusted to him for his own personal use. Ruedlinger himself valued his Florida residence to be worth $2,000,000.[7] Ruedlinger also purchased condominiums and a horse ranch. During several years of DRI's operation, it owned a jet airplane. The jet was primarily used by Ruedlinger. Although used by Ruedlinger for legitimate business purposes, the jet was generally viewed as an extravagance incurring bills in excess of a half-a-million dollars per year.

During its case, the government introduced Ruedlinger's tax returns which reported adjusted gross income in the following amounts:

| Year | Adjusted Gross Income |
|------|----------------------|
| 1988 | $1,407,505 |
| 1989 | $1,053,459 |
| 1990 | $ 612,338 |
| 1991 | $ 602,597 |

Around the end of 1989 and throughout 1990, DRI began to encounter dire financial straits. On or about the Labor Day weekend of 1990, Ruedlinger scheduled a meeting to discuss the management structure of DRI. Prior to the meeting, Greg Smart had acted as Chief Executive Officer of DRI. As CEO, Smart called many of the shots for DRI. At a meeting held on the Tuesday after the Labor Day weekend, Ruedlinger announced that there would be a change in management style: Ruedlinger at the top and then the next layer of management consisting of four equal parts of responsibility split between Smart, Mark Nordstrom (executive vice-president in charge of marketing), John Dietrick (general counsel) and Jim Steele (chief financial officer).

During that same meeting, Steele made a presentation to the management group re-

---

obligations under the PIP agreements. Other members of the program who did not have negative balances withdrew from the program prior to its collapse and received their reserve balances.

7. Over the defendant's objection, the government was permitted to introduce and publish to the jury a videotape of Ruedlinger's seaside Florida residence. The videotape was prepared to market the home for sale. The exterior and interior of the home are opulent. In the videotape, dolphins (or some similar aquatic mammals) could be seen swimming in the ocean directly behind the residence's backyard.

garding DRI's desperate financial condition. Most significantly, DRI was at that time unable to properly fund the insurance reserves that it was contractually obligated to maintain, including FAA's reserves. Nordstrom testified that Ruedlinger gave no indication of surprise to Steele's announcement. Conversely, Nordstrom testified that he was personally "devastated" and "shocked" by the announcement.[8]

Part of DRI's financial difficulties were directly attributable to the embezzlement of at least $220,000 by Greg Smart. Through various accounting tricks, Smart successfully skimmed money out of the DRI coffers to finance the building of his home, to purchase several major appliances and to buy other personal items including sporting equipment.[9] Smart's activities were discovered near the time of the 1990 Labor Day meeting with senior management.

After Smart's embezzlement was discovered by DRI, Ruedlinger, who was then living in Florida, came to Topeka for a meeting with senior management to determine what to do about Smart. Despite the discovery of Smart's chicanery, Ruedlinger did not want to fire him. Only the persistent badgering of DRI's senior officers, Mark Nordstrom and John Dietrick, persuaded Ruedlinger to terminate Smart's employment with DRI. Smart was terminated in September of 1990. DRI and Smart entered a confidentiality agreement regarding the terms and conditions of his termination.

Following Smart's departure, DRI's senior officers and management team consisted of Nordstrom, Dietrick and Steele. After Smart's termination, Nordstrom was named president of DRI and Wheatland Group Holdings. Dietrick remained as general counsel; Steele remained as chief financial officer. However, Ruedlinger, in his role as chairman of the board, was the person ultimately in charge of DRI and was consulted or copied on every major decision.[10] Ruedlinger had daily contact by telephone with the members of the management team and was provided a nightly package of all communications and correspondence throughout the company for him to review. Particularly after Smart's termination, Ruedlinger was intimately involved in the operation of FAA.

Subsequent to the discovery of Smart's embezzlement, Steele, DRI's chief financial officer, embarked on an effort to access the damage caused by Smart's activities and to ascertain the current financial status of DRI. In a memo dated October 4, 1990, Steele reiterated the statements he had made during the post–Labor Day weekend management meeting, and opined:

> On Friday, September 21, I met with Ed Carpenter and Dave Carpenter. The purpose of this meeting was to discuss reserve accounts held by DRI and to discuss long term plans for our treatment of those reserves. The meeting expanded beyond that question into corporate financing and specifically financing for our real estate.
>
> In this memo the term "reserves" or "trusted funds" means amounts held for payment of claims under agreements with

**8.** Similarly, John Dietrick testified that until after Smart's termination in September of 1990, he "did not have any idea what kind of financial condition that (sic) company was in until we started receiving this information when we became the CEO and Mark Nordstrom became president of the company."

**9.** Smart did not limit his illegal activities solely to DRI. Smart, in his capacity as a board member with Merchants National Bank, also embezzled funds from that institution. Smart was subsequently convicted of bank fraud and sentenced to 26 month primary term of incarceration.

**10.** Ruedlinger was immersed in matters both big and small. Nordstrom testified that during the time of the serious cash flow problems he received memos from Ruedlinger "that would be as detailed as asking what was being served in the cafeteria and recommendations on how to cut costs on green beans, you know, small things like that were constantly being brought to our attention, and, you know, you can change all the green beans you want to, you're not going to change the fact that we need sufficient cash to keep the company going, substantial cash." Trans. at 1619–20.

insurance companies or the National Federation under the partners in Protection Program. These reserves are not insurance company reserves. The reserve is an amount otherwise payable to an insurance company as premium, but under agreement with that insurance company, is withheld and trusted with DRI in order to fund claims payments under the policies sold.

We have agreement within the corporation and from outside counsel that we must work toward funding the reserves. The reserve amount must be funded by cash or other appropriate investments. The reserve amount must at all times be available in its entirety to fund claims payments.

In addition, the reserve amount should be sheltered from general creditors or our corporations to the extent that that is possible. This concept is important to ongoing corporate operations and is important to the insurance companies and the Partners In Protection fund.

The reserve amount must ultimately be unencumbered except for the responsibility to the insurance company and to insureds to make claims payments under the policies sold.

Today we cannot fund the reserve amount. Our companies have expended part of the reserve amount for other corporate operations. Our companies have encumbered funds otherwise available for reserves in order to capitalize our insurance company.

The first issue decided was whether or not a reserve fund should be established today knowing that it cannot be properly funded today. It was the consensus that establishing the reserve fund today is important. It is important because it will establish the fixed responsibility of our other corporations to fund the reserve. It is important because it will establish the commitment for our corporations to fund the reserve. And finally, it is important to establish with the insurance companies our position and intent to properly fund the reserves.

. . .

The next issue is how to get to a wholly funded unencumbered reserve fund. The facts are that we cannot accomplish this overnight. It will require a reasonable and practical plan. It will require discipline on the part of our companies and our management. We discussed time tables and spoke in terms of a 48 month time table during which the reserves would be fully funded and the reserve fund would be unencumbered.

We discussed the immediate formation of a reserve corporation. The reserve corporation would receive transfer of assets from DRI representing the reserve fund. That transfer would probably include a transfer of certificates of deposit now held at Merchants National Bank. Those CDs total $3,060,000. Those CDs are hypothecated or pledged to secure debt at Merchants National Bank. The debt is $3,000,-000. As the debt is repaid the pledge or lean (sic) on these CDs would be released thereby creating unencumbered funds in the reserve corporation.

The transfer of hypothecated CDs will not fully fund the reserves. We discussed the funding of the remaining reserves by issuing a note payable from DRI to the reserve corporation. The note would call for periodic payment of principle (sic) and interest payments would be made as due.

Government's Exhibit # 23. In addition to funds taken by Smart, the money that was supposed to have been held in reserve in a fiduciary capacity had apparently been used to satisfy general operating expenses and to capitalize United International Insurance Company, a subsidiary of WGHI.

The new management team's efforts to upright DRI were largely unsuccessful. Although it appeared that All American would loan sufficient money to DRI in 1992 to permit the business to survive, during the summer of 1991, DRI's cash shortage was so severe that it did not appear that it could make it until the fall .of 1991. In June of 1991, DRI was "totally, completely out of money." At that point in time, WGHI and

its subsidiaries were already indebted to Merchants National Bank for several million dollars. On June 19, 1991, in an effort to obtain additional financing from Merchants National Bank, Nordstrom wrote a letter to the president of Merchants National Bank in which he projected as "a virtual certainty" gross revenue for DRI in the amount of approximately $40,000,000 for 1991–92. However, DRI's projections of future financial success were dependent upon the occurrence of several events, some disclosed, some not disclosed to Merchants National Bank. In order for DRI to survive, some or all of the following events would had to have occurred: curtailing DRI operating expenses (including cutting the number of employees, selling the corporate jet, selling DRI's newly constructed building and leasing it back and possibly reducing Ruedlinger's voluminous salary), recapturing money used to capitalize United International Insurance Company, obtaining reimbursement from reinsurers and successfully obtaining substantial financing from All American.[11] The June 19, 1991, letter to Merchants National Bank assumed continuing and on-going business with All American.

Ruedlinger and WGHI's senior officers met with Merchants National Bank to obtain additional financing. Ruedlinger indicated to Merchants National Bank that DRI would fold without an additional extension of credit. As DRI and its companies already owed Merchants National Bank millions, the prospect of loaning more money apparently seemed more palatable to Merchants National Bank than losing the entire loan. Under what might aptly be characterized by the adage "in for a penny, in for a pound," Merchants National Bank advanced additional funds to DRI. In return for its loans to DRI, Merchants National Bank enjoyed a blanket security interest in "all aspects of all Ruedlinger companies."

Exhibits 1–4, 7–10[12] are spreadsheets prepared and presented to the Board of Directors of FAA. Those spreadsheets were sent through United States mails. On each of those reports the final tabulations show positive reserve balances for the recipient member as of 6/30/91. Ostensibly, those reports indicate that the members' reserves in fact existed and were earning interest in accordance with the terms of the PIP agreement. In reality, and as Ruedlinger and his management team knew several months before, no such reserves existed.

In October of 1991, Nordstrom left DRI based upon his belief that it would not be possible to fund the reserves or to keep DRI afloat. Dietrick left WGHI in November of 1991. Nordstrom and Dietrick subsequently formed their own company, Monarch Management Corporation, which essentially stepped into the place of DRI in its relationship with All American. DRI apparently sued Nordstrom and Dietrick for a violation of a non-competition clause that was part of their DRI employment contracts. Ultimately that litigation resulted in Nordstrom and Dietrick executing a promissory note agreeing to pay DRI $2,000 per month for ten years.

Jim Steele left DRI in January of 1992. Dennis Miller replaced Steele as chief financial officer. John Frazier assumed the role of CEO. Despite their efforts to save the company, DRI was destined for financial ruin. In April of 1992 All American gave notice that it was terminating its relationship with DRI. The departure of DRI's largest revenue source signaled the beginning of the end. On May 21, 1992, Merchants National Bank exercised its right of setoff against DRI's funds deposited in its bank. In total, Merchants National Bank seized approximately $363,000 from DRI's accounts. *See* Government's Exhibit # 58; Trial transcript at 432. Part of the funds seized on May 21,

---

**11.** The president of All American, Cordon Crosby, was apparently a close personal friend of Ruedlinger's.

**12.** Government Exhibit # 1 corresponds to Count One of the Second Superseding indictment; Government Exhibit # 2 corresponds to Count 2, etc ... This symmetry continues through and including Government Exhibit # 17.

1992, were all of the funds in the FAA account, a total of only $52.28. After Merchants National Bank exercised its right of setoff, DRI still owed Merchants National Bank "several million dollars." Trial transcript at 457.

Word of DRI's severe financial distress soon spread. Parties to the PIP agreement grew concerned about the security of their reserve accounts. Based upon the perception that DRI was dead in the water, members were also concerned that the demise of DRI and FAA would also result in a lapse in liability coverage. Members sponsoring sporting events during the summer of 1992 were concerned that FAA's demise would necessitate the cancellation of such events unless alternative liability insurance could be obtained.

In response to a mounting number of concerns, on June 5, 1992, Ruedlinger conducted a telephone conference meeting of the FAA board of directors. Persons participating in the phone call were situated in different states. During that conference call, members of the board expressed their concern about the location of the members' reserves and whether the members were currently covered by liability insurance. Despite his general assurances that everything was "Ok", many of the members were not satisfied with Ruedlinger's limited explanations regarding the location of the reserves. Ruedlinger grew agitated during the conversation. In pertinent part, the following is an excerpt from the transcript of that conversation: Dick Neil (Member of FAA Board of Directors):

> Doug, as Board Members, it has been mentioned by most of us already. We have some responsibilities and feel that we need to be accountable. We probably should see FAA financials as soon as possible so that we know, and have documentation, that in fact that Partners in Protection is solvent.

Douglas Ruedlinger:

> For what it's going to be worth, I will step out of bounds here and talk about the financial situation and I would like to trust the confidence of you peoples at, I'll go out of bounds and do this. My lawyers are probably going to shoot me for doing this, but I am going to do it. The situation that is going on between All American and us is a situation involving, again, lost reinsurance. But as we got into discovery, it was discovered that All American owes me something in the neighborhood of $14 million, and that's a big number. All American feels, and I do rightfully, I'll be happy to admit this, that we owe them probably maybe $1 or $2 million because of a hole in a reinsurance policy on some college help. Now, the part of the court case that is getting very hairy is, okay, we want to see all of these reserves. The Ruedlinger Companies are about six or seven companies, one of which is the Fund Administrators Association. We want to see all of the assets, we want to see all of the deposits and we have fought that we have told them to go straight to hell. The only thing that they can look at is Doug Ruedlinger, Inc. And they, quite frankly, are fighting on it. I will admit the other day, I said, "Nelson, I'll be happy to send you the bank balance on the Fund Administrators Association and show it to you." I had mentioned that to our attorneys and they said, "Jesus, God, don't do that. They'll go to Nelson. They'll subpoena him and, boom, he has got to disclose that." Right now, it's my battle. This is substantial sum of money, I mean gentlemen, we're talking about a potential award to me from All American in the neighborhood of $60–$100 million for what they have done to us. And you can take all the stories you have heard in the streets out there about All American this, and All American that, and Doug Ruedlinger this, and Doug Ruedlinger that. I have a New York law firm that said, "Doug, we generally operate only, only on a straight hourly fee basis. We'll take this one on contingent. It's too damn good." I know we are going to walk away from this with big dollars. I have got to be protected. I have got to protect our information. I will bring it to the board meeting. When

we hand out the spreadsheets, you will see your bottom lines and you will see certified bank statements that the money is there in banks.

Transcript of Exhibit 11. Based upon Ruedlinger's personal assurances that all of the information the directors desired would soon be disclosed, most of the board seemed temporarily satisfied and relieved.

Ruedlinger's promises only temporarily stemmed the rising tide of suspicion and discontent. On June 10, 1992, Randall Forbes, an attorney representing the Kansas High School Activities Association, placed a telephone call to Ruedlinger in Florida. During that telephone call Forbes asked Ruedlinger questions regarding the existence and location of his client's reserves. Ruedlinger indicated that the reserves were fully available and adequately protected. Despite his general assurances regarding the existence and sanctity of the reserves, Ruedlinger would not divulge their actual location.

In a memo to the FAA board dated June 10, 1992, Ruedlinger summarizes his version of the June 5, 1992, conference call. The memo was also prepared "to give you food for thought as to what insurance role the Fund Administrator Association (The Fund) and you as directors play with regard to the insurance programs for the future." Ruedlinger also summarizes the history of FAA and the achievements made by the board through the PIP agreement. Foreshadowing future events, the memo further states:

As mentioned in the telephone conversation, it is my intention to offer to The Fund board three alternatives: (1) continue the current program with Homestead as the lead insurer and our current block of reinsurers; (2) the Board consider commercially underwritten converages which would, as best as possible, duplicate the program that they now have in effect (without litigation liability); (3) totally disband the Fund Administrators Association, commence a runoff of existing claims, advise the members to purchase their coverages locally

(the same we did with the auto coverage) and refund the reserves in accordance with the agreement. To be very honest, I can live with any of the above.

Government Exhibit # 6 at 3–4. The letter essentially blames unnamed self-serving members of the FAA board for the deterioration of the organization's commitment to the ideals upon which it was founded and intended to serve.

In a letter dated June 11, 1992, addressed to Nelson Hartman, Executive Secretary of the Kansas State High School Activities Association, (Government's Exhibit # 5), Ruedlinger takes Forbes to task for his June 10, 1992, telephone call. Ruedlinger's letter essentially takes umbrage at Forbes' questions regarding the amount and location of FAA reserves. Ruedlinger reiterates the position that he took during the June 5, 1992, telephone conversation, indicating that he was unable to disclose the amount and location of FAA's reserves based upon his legal dispute with All American. Ruedlinger also states that he intends "to follow through with what I pledged to the Board regarding information that will be presented at the board meeting."

As scheduled, on June 30, 1992, the persons comprising the FAA board of directors met in Fort Lauderdale, Florida. Upon their arrival, Ruedlinger distributed a letter to the board members. In pertinent part, the June 30, 1992, letter states:

Dear Friends:

At a stockholders meeting on Monday, June 29, 1992, the shareholder dissolved the Fund Administrators Association, Inc., effective immediately. Doug Ruedlinger, Inc., will obviously no longer be needed to serve as administrator. The former Board has been removed, and will cease to function.

A final certified audit will commence immediately and any obligations resulting will be accounted for, satisfied, or pursued, as the case may be.

We have effected binders for former members into like coverages for a period of ten (10) [subsequently changed to 20] working days. A letter fully explaining this transi-

tion and an application will be received in the former members' offices via FAX or Federal Express within ten working days. Complete details regarding the coverages will be included in the information sent to the members.

Those desiring to continue with the proposed insurance coverages may do so by acknowledging this offer within ten working days of the receipt of same, and completing and referencing the enclosed application. The coverage will be placed for the new group for the 92/93 school year. All aspects of the program, plus other options will be offered and explained.

It should be clearly understood that the Life Time Catastrophe Coverage will be renewed without changes, and it is not affected in anyway (sic) by this action.

Anyone desiring additional information regarding this action may do so by calling Doug Ruedlinger, 904–423–1100, or via FAX 904–423–3617.

Sincerely,

FUND ADMINISTRATORS ASSOCIATION, INC.

By: Douglas O. Ruedlinger

Therefore, instead of providing the information regarding the amount and location of FAA reserves as previously promised, Ruedlinger had simply dissolved the corporation.

Many members of the board were incensed by Ruedlinger's actions.[13] Many directors were concerned about the status of other insurance programs purchased from DRI. In response to those inquiries, Ruedlinger indicated that any former FAA member who wanted to guarantee continued coverage, including coverage of injured students under other DRI insurance programs, would have twenty days to join a "new" insurance package offered by Ruedlinger. Otherwise, those other coverages, including insurance for any seriously injured student, would no longer receive benefits from any DRI insurance program.

As indicated in the June 30, 1992, letter distributed to the FAA board of directors, a certified audit was subsequently performed. The audit was performed by Braunsdorf, Carlson and Clinkinbeard (BCC), certified public accountants. Despite contractual assurances that the PIP agreements were separate and distinct from other DRI insurance programs such as LifeCat, the final audit setoff amounts purportedly owed to DRI by the member associations from other insurance programs purchased from DRI. According to that audit, FAA members did not have a cumulative positive reserve balance, but in total actually owed FAA an additional $543,-138. In response to confirmation letters sent by the auditing company, most of the members contested the "setoff" procedure used to arrive at the negative final reserve balance.

13. During the meeting, the following colloquy between Tom Henry, former member of the FAA board of directors, and Ruedlinger occurred:

MR. HENRY: The last thing I want to say is that I'm relatively new on the board, I don't really understand everything that's going on, but I do know this, in Himmerdale, I stood up against executive committee and most of them at one time, most of the association representing this board and this fund and nobody—and because I thought it was right and I thought what we were doing is right. I realize that businesses can go under and times can go bad. I didn't come prepared to pull out of the Federation Fund. I was going to be loyal to the end.

Doug, I'm really disappointed in things I have heard and the way you treated us today. We were your board and we fought, we met a group of people that were our peers and turned the vote around. I thought it was shabbily done. I thought it was wrong and I'm still set against it. I just feel like that we deserve better treatment than this in this particular case.

I mean, I can't go out and tell anybody anything. My recommendation to my people will be just get out of Dodge because Dodge just closed down, ain't nothing left there.

MR. RUEDLINGER: That would be inaccurate, but you go ahead and make that statement. That would be fine.

MR. HENRY: What really upset you, Doug, you didn't want us to ask where the money was, so it is what you got, you got the last word in. You didn't want to show us where our money was.

Instead, members believed that Ruedlinger was using the "setoff" procedure as a means of cheating the FAA members out of approximately $1.6 million.

Ultimately, FAA members who did not withdraw from the PIP agreement prior to June of 1992 did not receive any of their reserves. Several FAA members sought and obtained judgment against DRI and/or Ruedlinger personally. However, virtually all of the judgment creditors' efforts to actually collect on their judgments have apparently been unsuccessful.

### Defendant's Case

Ruedlinger did not testify on his own behalf.[14] However, Ruedlinger did present substantial evidence in his own defense. Ruedlinger's defense was multi-faceted. One constant throughout each witness' testimony was the fact that until April of 1992—the time that All American cancelled its relationship with Ruedlinger—every insured's claim and every duty to defend was apparently fulfilled by DRI and its subsidiaries. However, after the termination of its relationship with its largest revenue source, DRI and its related companies essentially collapsed.

Ruedlinger's prognostications of multimillion dollar verdicts against All American did not come to fruition. Instead, All American prevailed against Ruedlinger in that legal dispute. During trial, Ruedlinger suggested that the loss of his legal dispute with All American was attributable to a lack of finances to properly litigate his claims on the merits. Similarly, Ruedlinger suggested that

the lack of sufficient resources precluded him from defending against several legal claims, including a claim by the National Federation of State High School Athletic Association. Ruedlinger settled that case by permitting judgment to be entered against him in the amount of $1,000,000. *See*, Government Exhibit # 74.

Ruedlinger introduced evidence of several instances of philanthropy during the time he was selling insurance to high schools and high school athletics association. Ruedlinger also produced character witness testimony from longtime associates who firmly believed that Ruedlinger had an excellent reputation for truth, honesty and integrity.

Standing as the centerpiece to Ruedlinger's defense was his contention that he was an outstanding member of the community who had provided valuable insurance throughout the thirty year operation of his legitimate business. Flowing from Ruedlinger's "legitimate business" argument was the corollary that DRI's management team was comprised of numerous respected professionals, including attorneys, and that he had relied on them in conducting the day to day affairs of his companies.[15] In addition to internal monitoring by DRI employees, Ruedlinger pointed to numerous outside audits by interested parties including All American and the fact that his operation was able to pass the scrutiny of trained accountants. Moreover, the FAA directors themselves were provided with sufficient information to evaluate DRI's operations and that the directors were personally motivated to act as

---

**14.** In a hearing outside the presence of the jury, Ruedlinger indicated that although he was aware that he had an absolute right to testify in own defense, he would exercise his Fifth Amendment right against self-incrimination. Ruedlinger indicated that he reached this decision after consultation with his attorney. Ruedlinger asked for and received the following jury instruction:

> The defendant in a criminal case has an absolute right under our Constitution not to testify.
> The fact that the defendant did not testify must not be discussed or considered by the jury in any way when deliberating and in arriv-

ing at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

> As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Jury Instruction No. 21.

**15.** Although not specifically requested, the court included an "advice of counsel" instruction in its proposed instructions. Over the government's objection, that instruction was included in the final instructions provided to the jury.

watchdogs for their own self-interest. Ruedlinger pointed to the final audit by Braunsdorf, Carlson and Clinkinbeard as further evidence that he did not profit, illegally or otherwise, from FAA.

Conversely, Ruedlinger pointed the finger of blame at others for his company's demise. The embezzlement by Greg Smart and its impact on DRI was repeatedly explored. Ruedlinger, however, primarily focused his financial demise on the actions of All American and its decision to terminate its relationship with DRI.

Ruedlinger also challenged the government's allegations that he did not act as promised and that he breached his fiduciary duties to FAA members. In regard to DRI's obligation to place FAA members' reserves in money market certificates, Ruedlinger pointed to the fact that at the end of every day the money on deposit at Merchants National Bank was "swept" and placed in interest earning devices.

### Verdict and Subsequent Events

On April 7, 1997, the jury returned a verdict finding the defendant, Douglas O. Ruedlinger, guilty of all ten counts of mail fraud, both counts of wire fraud and on one count of money laundering (Count 17). The jury found the defendant not guilty on four counts of money laundering. Trial on the bifurcated issue of forfeiture was set to commence on April 21, 1997. On April 10, 1997, the government filed a motion to dismiss Count 18, indicating that upon further reflection of the current state of the law and the status of other pending matters against the defendant it wished to pursue the forfeiture issue civilly. On April 11, 1997, the court granted the government's motion to dismiss Count 18. On that same day the jury was notified telephonically that their service was no longer necessary in light of the dismissal of Count 18; the jury was discharged.

### Sufficiency of the Evidence: Wire and Mail Fraud

### Elements of Wire and Mail Fraud

The elements of wire fraud under 18 U.S.C. § 1343 are: "(1) a scheme or arti-fice to defraud or obtain money by false pretenses, representations or promises; and (2) use of interstate wire communications to facilitate that scheme." *United States v. Drake*, 932 F.2d 861, 863 (10th Cir.1991). A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be proved. *United States v. Cronic*, 900 F.2d 1511, 1513–14 (10th Cir.1990).

"[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir.1994). The objective reference to "persons of ordinary prudence or comprehension" assists in determining whether the accused's conduct was "calculated to deceive." *Drake*, 932 F.2d at 864. Fraudulent intent is required. *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980). That said, a scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, and deceitful concealment of material facts may constitute actual fraud. *Williams v. United States*, 368 F.2d 972, 975 (10th Cir. 1966), *cert. denied*, 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345 (1967); *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). "[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations." *Themy*, 624 F.2d at 965.

*United States v. Cochran*, 109 F.3d 660, 664–65 (10th Cir.1997).

The elements of mail fraud are virtually identical to the elements of wire fraud, the one exception being that the government must prove that the defendant used the United States mail to facilitate the scheme in-

stead of interstate wire communication facilities. *See United States v. Czubinski*, 106 F.3d 1069, 1076 n. 10 (1st Cir.1997) ("Identical standards apply in determining the 'scheme to defraud' element under the mail and wire fraud statutes.") (quoting *United States v. Boots*, 80 F.3d 580, 586 n. 11 (1st Cir.1996)). The mail fraud "statute clearly contemplates a separate mail fraud count each time the mail is used to help execute the fraudulent scheme—not each time a misrepresentation is made." *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir.1995); *see United States v. Pepper*, 51 F.3d 469, 472–73 (5th Cir.1995) (although the government must prove the existence of the scheme to obtain money or property by misrepresentations, "[t]here is no statutory requirement that direct misrepresentations must be made to the victims of the scheme").

### Analysis

■ Based upon the direct and circumstantial evidence introduced at trial, a rational factfinder could easily have found Ruedlinger guilty of each count of which he was convicted.[16] As summarized above, *at least by the fall of 1990*, Ruedlinger personally knew that DRI was out of money and that all of the reserves that it was supposed to be holding in a fiduciary capacity, including the funds supposed to be held for FAA members, did not exist. Despite that knowledge, Ruedlinger did not inform the FAA members of that fact. In fact, Ruedlinger specifically instructed the management team not to disclose DRI's financial condition. Instead,

Ruedlinger sent materially misleading information through the United States mails which was designed to lull FAA members into believing that their reserves existed, were on deposit and earning interest. Although other moneys flowed through DRI's coffers after the fall of 1990,[17] based upon the precarious financial status of Ruedlinger's companies, including the outstanding loans and encumbrances on DRI's assets, Ruedlinger had to know that all written communications distributed to the FAA board of directors and FAA members indicating that the reserves existed were absolutely false.

After Merchants National Bank setoff DRI's accounts on May 21, 1992, *under no circumstance* could Ruedlinger have believed that the FAA members' reserves actually existed. No evidence suggested that Ruedlinger's assurances that the reserves were being held in a secret location was anything but a transparently thin ruse to hide the fact that the money had already been dissipated. As noted above, on May 21, 1992, the FAA account contained reserves equalling $52.28, over $1.6 million short of the amount that was supposed to have been held as reserves. Armed with that knowledge, Ruedlinger still persisted in perpetuating the scheme to defraud FAA members by informing them that their reserves actually existed and that they were earning interest in some mystery location known only to him. Both interstate telephone calls—one made on June 5, 1992, the other made on June 10, 1992—were clearly designed to lull the FAA members into forestalling any further efforts to ascer-

---

16. Based upon the evidence presented and its verdict on the other counts, the court is uncertain on what basis the jury found the defendant not guilty on Counts 13–16. The court notes that the lone money laundering conviction, Count 17, concerned a transfer of money in the fall of 1992, well after the primary collapse of DRI. There was also evidence that the money was transferred at Ruedlinger's express direction. In any event, the "not guilty" verdicts on Counts 13–16 do not undermine the validity of the defendant's other convictions. *Cf. United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

17. As he did at trial, Ruedlinger points to evidence that after Steele's announcement of unfunded reserves in the fall of 1990, several million dollars in unprocessed premiums flowed through DRI. The fact that additional funds came into DRI after the fall of 1990 is not dispositive on the issue of intent as DRI was only entitled to a percentage of those amounts as a processing fee. In any event, there is substantial, compelling evidence that Ruedlinger personally knew in 1991 and 1992 that his companies, including FAA, were insolvent and unable to fund reserves as contractually guaranteed, yet continued to lead clients, including FAA members, to believe that their reserves existed.

tain the whereabouts of their reserves. All of those communications, both written and oral, clearly fall within conduct respectively prohibited by federal mail and wire fraud statutes. *See United States v. Sampson,* 371 U.S. 75, 81, 83 S.Ct. 173, 176, 9 L.Ed.2d 136 (1962) ("We cannot hold that such a deliberate and planned use of [lulling letters in] the United States mails by defendants engaged in a nationwide, fraudulent scheme in pursuance of a previously formulated plan could not, if established by evidence, be found by a jury ... to be 'for the purpose of executing' a scheme within the meaning of the mail fraud statute.") (quoting 18 U.S.C. § 1341); *United States v. Massey* 48 F.3d 1560, 1566–67 (10th Cir.) ("Lulling letters can further a fraudulent scheme for the purposes of the mail fraud statute."), *cert. denied,* 515 U.S. 1167, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995); *United States v. Kelley,* 929 F.2d 582, 585 (10th Cir.) ("[M]ailings which facilitate concealment of a fraudulent scheme meet the 'furtherance' requirement [of section 1341]."), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991); *see also United States v. Griffith,* 17 F.3d at 874 (lulling theory applies equally to wire fraud convictions). As this court has previously stated, it is enough then if the communications are important in maintaining the operation of an ongoing fraudulent scheme.

In his motion, Ruedlinger contends that even if any statement disseminated by either mail or wire were "misrepresentations," those misrepresentations were not material. Ruedlinger suggests that the information he imparted to FAA members was "mere puffing or exaggeration." Ruedlinger also contends that any misrepresentations attributable to him could not have been calculated to deceive persons of ordinary prudence. On their face these arguments fail as it is obvious that no member enjoying a positive balance would have continued to contribute money to the fund or would not have immediately made every effort to withdraw their reserves if Ruedlinger had honestly reported the current status of the members' reserves at any point after the fall of 1990. These arguments also ignore the testimony of several witnesses who represented members of the FAA. From that evidence the jury could have reasonably concluded that Ruedlinger's numerous misrepresentations regarding the existence of the reserves were material and that they were calculated to deceive persons of ordinary prudence. Ruedlinger occupied a position of trust. Ruedlinger's personal assurances in written and oral form clearly duped sophisticated persons into operating under the mistaken belief that their reserves were secure. Based upon their belief that the reserves as reported by DRI actually existed, some members of FAA even carried their FAA reserves on their respective accounting books as assets. Ruedlinger's misrepresentations were clearly material.

Even if Ruedlinger labored under the misapprehension that someday everything might work out and that DRI might someday pull out of its financial nosedive, that belief would not have justified the multitude of untrue material misrepresentations disseminated to FAA members.[18] *See United States v. Pap-*

---

**18.** The court gave the following instruction to the jury in its closing instructions:

One of the issues in this case is whether the defendant acted in good faith. Good faith is a complete defense to all of the charges in the second superseding indictment if it is inconsistent with intent to defraud which is an essential element of each charge. The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case. It is the government's burden to prove to you, beyond a reasonable doubt, that the defendant acted with the intent to defraud as charged in the second superseding indictment.

Evidence that the defendant acted in good faith may be considered by you, together with all the other evidence, in determining whether or not he acted with the intent to defraud.

Fraudulent intent is not presumed or assumed; it is personal and not imputed. One is chargeable with his own personal intent, not the intent of some other person. Bad faith is an essential element of fraudulent intent. Good faith constitutes a complete defense to one charged with an offense of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. Evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent. In order to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally at-

*pert*, 112 F.3d 1073, 1076 (10th Cir.1997); *United States v. Reddeck*, 22 F.3d 1504, 1507 (10th Cir.1994) (" '[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations.' " (quoting *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980))). Ruedlinger clearly acted with a fraudulent intent in both his written and oral communications to the FAA board of directors and FAA members.

## BCC's Post–Mortem Audit

As he did at trial, Ruedlinger contends that he must be factually innocent of making any fraudulent misrepresentations based upon the calculations contained within the final audit of FAA performed by BCC. As indicated above, the BCC final audit reaches the conclusion that FAA members collectively did not have a positive reserve balance, but instead actually owed the fund $543,138. Based upon its verdict, the jury clearly sided with the government's contention that the BCC final audit did not accurately measure each individual member's reserves or the total amount of FAA's reserves. That finding was a reasonable and appropriate construction of the evidence regarding FAA and its interrelationship with other DRI programs. FAA members clearly contested the reserve amounts calculated by BCC, primarily based upon their contention that it was improper to use amounts purportedly owed to LifeCat to offset FAA reserves. Because the underlying premise of the audit was ill-founded, the jury was free to reject its conclusions regarding FAA reserves. The jury could easily have discounted this evidence as the equivalent of an accounting slight of hand—one last, desperate attempt by Ruedlinger to avoid liability for his illegal acts. The court

simply notes that according to the final audit, DRI owed FAA over a million dollars for an outstanding loan.

## Sufficiency of the Evidence: Money Laundering

Having concluded that sufficient evidence supports all of the mail and wire fraud convictions, the court will turn its attention to the money laundering conviction. Title 18, United States Code § 1957 makes it a federal crime to engage in monetary transactions in property derived from certain specified unlawful activities including mail fraud and wire fraud. This crime is commonly referred to as "money laundering." Counts 13–16, the money laundering counts of which Ruedlinger was acquitted, concerned deposits by FAA members in 1991. Count 17, the money laundering count on which he was convicted, was a transfer of a $15,257.52 check from the Washington Interscholastic Activities Association, alleged to have occurred on or about September 9, 1992. Yolanda Bennett, a former DRI employee, testified that she received the check on behalf of FAA in Topeka, Kansas, and transferred the check to Ruedlinger in Florida as he had directed. Notations on the check indicate that the payment was for the PIP program.

Over the past few years, the Tenth Circuit has had several occasions to discuss the money laundering statutes. "The essential elements of a § 1957 violation are that (1) the defendant engage or attempt to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from 'specified unlawful activity.' " *United States v. John-*

tempted to deceive another. One who knowingly and intentionally deceives another is chargeable with fraudulent intent notwithstanding the manner and form in which the deception was attempted.

One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion is erroneous or his belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in

judgment or an error in management, or was careless, does not establish fraudulent intent.

On the other hand, an honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith" as used in these instructions if, in carrying out that venture, the defendant knowingly made false or fraudulent representations to others with the intent to deceive them.

*son,* 971 F.2d 562, 567 n. 3 (10th Cir.1992) (citing *United States v. Lovett,* 964 F.2d 1029 (10th Cir.1992)).

Based upon the jury's findings regarding the mail and wire fraud crimes, it is clear that money Ruedlinger derived from deposits by FAA members after 1991 was the product of his unlawful activities. In the fall of 1992, the FAA program was completely insolvent. FAA's insolvency is directly attributable to Ruedlinger's scheme to defraud.

Ruedlinger contends that his conviction must be vacated based upon the Tenth Circuit's construction of § 1957 in *Johnson.* Ruedlinger suggests that he must be acquitted of Count 17 because "Congress intended that the money laundering statutes to apply to transactions occurring after the completion of the underlying criminal activity," and that at the time the funds were deposited into the SunBank, Daytona Beach Florida, they were not criminally derived proceeds. The government responds, arguing that "[s]ubsequent Tenth Circuit developments have distinguished *Johnson* to the point of oblivion."

The court agrees that *Johnson* is distinguishable from the case at bar. In *Kennedy,* the Tenth Circuit distinguished *Johnson:*

> In *Johnson,* the defendant was charged with money laundering under a companion statute, 18 U.S.C. § 1957. Section 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property," which is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(a), (f)(2). Each count against the defendant in Johnson was based on a wire transfer of funds from an investor's account directly into the defendant's account. *Johnson,* 971 F.2d at 567. Thus, the predicate crimes were the use of the wires in violation of 18 U.S.C. § 1343. Significantly, however, the only wirings that were alleged to support the predicate wire fraud crimes in *Johnson* were the very transfers

of funds identified in the money laundering transactions. 971 F.2d at 569. Based on that fact, we held that the wirings could not also be used to support convictions for § 1957 money laundering crimes.

Kennedy's case is thus distinguishable in one important and dispositive respect. As noted, the only use of the wires alleged in *Johnson* to prove the predicate wire fraud crimes were the very wire transfers that allegedly involved "criminally derived property" under the money laundering statute. In Kennedy's case, in contrast, the government alleged many prior mailings to prove the predicate mail fraud crimes, which occurred before the monetary transactions that formed the basis of his money laundering counts. Thus, unlike in *Johnson,* the illegal mailings in this case involved discrete, earlier mailings by Kennedy, rather than the receipt of funds by Kennedy from his victims. It was the subsequent and distinct transfers of funds that were alleged as the separate transactions involving "proceeds of specified unlawful activity" which constituted the alleged money laundering under § 1956.

This factual difference is important because Congress clearly intended the money laundering statutes to punish new conduct that occurs after the completion of certain criminal activity, rather than simply to create an additional punishment for that criminal activity. *United States v. Edgmon,* 952 F.2d 1206, 1213–14 (10th Cir. 1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *see Johnson,* 971 F.2d at 568–69. The "completion" of both wire and mail fraud occurs when any wiring or mailing is used in execution of a scheme; there is no requirement that the scheme actually defraud a victim into investing money for the crime to be complete. *See United States v. Hollis,* 971 F.2d 1441, 1451 n. 4 (10th Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993); *United ed States v. Kelley,* 929 F.2d 582, 585 (10th Cir.), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991); *United States v. Stewart,* 872 F.2d 957, 960 (10th

Cir.1989). Thus, because the money deposits in Kennedy's case occurred after other mailings had already completed the predicate mail fraud crime, those transfers properly could be construed as new transactions involving the proceeds of mail fraud. *See Hollis,* 971 F.2d at 1451 n. 4. In contrast, because the specific wire fraud violations alleged in *Johnson,* were not complete until the wires were used to transfer the funds, those transfers could not be construed as new transactions to support a money laundering offense. Accordingly, we reject Kennedy's contention that his money laundering convictions must be set aside for failure to allege the "proceeds" element of those crimes.

64 F.3d at 1478 (footnotes omitted). *See United States v. Pretty,* 98 F.3d 1213, 1220 (10th Cir.1996) ("We do not read our cases as holding that laundering can occur only after the underlying crime is complete . . ."), *cert. denied,* —— U.S. ——, 117 S.Ct. 2436, 138 L.Ed.2d 197, 1997 WL 82151 (1997). Based upon this discussion, *Johnson* provides Ruedlinger no solace. Count 17 is supported by sufficient evidence.

## Trial Errors

### Variance and Related Errors

"The Fifth Amendment requires that a defendant be tried only on charges handed down by a grand jury." *United States v. Wright,* 932 F.2d 868, 874 (10th Cir.), *cert. denied,* 502 U.S. 972, 112 S.Ct. 450, 116 L.Ed.2d 467 (1991). "A variance that broadens the indictment constitutes a constructive amendment and is reversible per se." *Id.* The prohibition against variances is designed to insure that the defendant has notice of the crimes charged. *United States v. Williamson,* 53 F.3d 1500, 1513 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995).

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States,* 442 U.S. 100, 105,

99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). However, a variance is not fatal to the government's case unless the variance affects "the substantial rights of the accused." *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

*Edwards,* 69 F.3d at 432. " 'A variance "is fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy." ' " *Williamson,* 53 F.3d at 1513 (quoting *United States v. Haddock,* 956 F.2d 1534, 1548 (10th Cir.1992) (quoting *Hunter v. New Mexico,* 916 F.2d 595, 599 (10th Cir.1990))).

Even assuming a variance between the indictment and the proof at trial, Defendants are not entitled to relief unless the variance affected their substantial rights. *See Powell,* 982 F.2d at 1432 (addressing substantial rights prong even though court concluded no variance existed); *United States v. Irwin,* 654 F.2d 671, 683 (10th Cir.1981) (same)

*Edwards,* 69 F.3d at 433.

### Analysis

In this case, no variance occurred. Even if a variance occurred, Ruedlinger's substantial rights were not affected. "[T]he fifth amendment grand jury guarantee is not violated if a defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment." *Wright,* 932 F.2d at 874 (quoting *United States v. Mobile Materials,* 881 F.2d 866, 874 (10th Cir.1989)). In this case, although unpersuaded as to each aspect of the scheme alleged in the second superseding indictment, the jury found Ruedlinger guilty of crimes falling within the scope of the scheme charged. *See United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985) ("As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to

a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.").

■ Contrary to Ruedlinger's suggestion, the court's instructions to the jury did not create a variance. First and foremost, at no point prior to instructing the jury did the defendant raise many of the objections of which he now complains. Fed.R.Crim.P. 30 provides in pertinent part:

> No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

The wisdom of this rule is exemplified by this case. Although the defendant made a handful of objections during the jury instruction conference, no objections concerning the elements of either the wire or mail fraud counts were raised. Had the defendant articulated several of these objections during the instruction conference or at any point before the jury returned its verdict, the court would have considered modifying the final jury instructions. This did not occur. On this basis alone, the defendant's objections to the instructions and verdict form are denied.

Prior to submitting proposed jury instructions to counsel, the court was concerned as to whether the second superseding indictment alleged a scheme to defraud or a scheme to obtain money by means of false or fraudulent representations. The second superseding indictment clearly alleges a scheme to defraud state high school athletic associations, but goes on to indicate that the scheme to obtain their money was achieved by the use of numerous false misrepresentations. After reviewing the second superseding indictment, the parties' proposed jury instructions and Tenth Circuit precedent, the court concluded that the proposed instructions that were given to counsel and ultimately to the jury were the most accurate and fair it could devise. Copies of the court's

instruction on Counts 1–10 (mail fraud) and Counts 11–12 (wire fraud) are attached to this opinion.

In drafting the proposed instructions, the court carefully considered the Tenth Circuit's decision in *Cronic.* In *Cronic* the defendant was convicted on eleven counts of mail fraud based upon charges arising out of a check kiting scheme. The indictment in *Cronic* alleged both a scheme to defraud and a scheme to obtain money by false or fraudulent pretenses, representations or promises. However, the jury instructions allowed the jury to be instructed only as to the offense of obtaining money by means of false or fraudulent pretenses or representations. "Thus, the government saddled itself with the burden of establishing that money was obtained from these banks *by means of* false and fraudulent *pretenses, representations, or promises.*" 900 F.2d at 1515.

In the case at bar, the court concluded that the instructions as proposed, *at worst,* saddled the government with the additional burden of proving at least one of the false promises charged in the second superseding indictment. Seeing no prejudice to the defendant, and hearing no objection from either party, the court instructed accordingly. Based upon the jury's responses to special questions in the verdict form, it is clear that the jury unanimously agreed that Ruedlinger was responsible for more than one false representation in the second superseding indictment. In any event, the court believes that its instructions correctly state the law *and* carefully tracked the language of the second superseding indictment. The special questions in the verdict form are taken directly from the second superseding indictment.

Ruedlinger contends that the second superseding indictment only alleged that state high school athletic associations were the victims, but the evidence at most showed false statements to the board of directors of FAA, an independent corporation. This argument ignores the plain language of the indictment and the evidence introduced at trial. Even the defendant in his arguments for new trial suggests that the FAA board of

directors served amongst other things as watchdogs for fellow members. Yet in the next breath, Ruedlinger contends that deception of those persons was not the crime charged in the indictment. Of course, the defendant's arguments also ignore the fact that spreadsheets reflecting positive reserves were distributed to board of directors who were also representatives of high school athletic associations that were actual members of FAA. Ruedlinger's intentional, fraudulent misrepresentations clearly deprived the actual victims, state high school athletic associations, of their reserves. No fatal variance occurred.

### Verdict Form Objections

■ For the first time, Ruedlinger objects to the verdict form. During the jury instruction conference, defendant's counsel had "[n]o objections to the verdict form." Specifically, Ruedlinger contends that the portion of the verdict form asking the jury to indicate which of the false representations or promises he used to defraud state high school associations out of money or property should have inquired as to each count, instead of generally inquiring regarding the false misrepresentations.

Even if he had timely objected, the defendant was not prejudiced in any sense by the verdict form. Had the court included no specific questions in the verdict form, the jury's verdict would obviously still stand if it was supported by substantial evidence. Frankly, those additional questions were included in the verdict form solely for the defendant's benefit. By requiring the jury to answer those specific questions, the defendant (if convicted) could focus his subsequent challenges on the false statements actually determined by the jury, rather than speculate as to the basis of their verdict. Because the special verdict questions are essentially irrelevant to sustaining Ruedlinger's convictions, the court's failure to require the jury to specifically answer the same questions regarding each and every count was not error. Nothing in the jury's answers to those questions suggests that their verdict was based

upon anything other than a rational application of the facts to the instructions. ·

■ In this same vein, the defendant contends that concealment of his scheme by operation of a Ponzi scheme cannot be a false statement or promise. This argument is again raised for the first time. In any event, the defendant was not harmed by the court's inclusion of the paragraph 10 of the second superseding indictment related to the Ponzi scheme on the verdict form. Ruedlinger shrouded his business in a cloak of legitimacy in part by operating a Ponzi scheme, an artifice that enabled his businesses to continue. By doing so, Ruedlinger was able to perpetuate the fraud that members' reserves were safe. Maintenance of such a facade is at its core a false misrepresentation of fact, and that facade was used to conceal the truth from FAA members.

In sum, the defendant was not prejudiced by the verdict form.

### Other Issues

### LifeCAT and Other Matters Related to the Second Case

■ After DRI's demise, several catastrophically injured students who believed they would receive medical care for life as promised by Ruedlinger were left with no financial support. The indictment in the second case, the one before Judge Rogers, primarily charges fraud arising out of DRI's LifeCat program, an insurance program for catastrophically injured student athletes. Prior to trial the court entered an order denying the defendant's motion for continuance based in part upon the government's statements that it intended to treat the Life-Cat program and the PIP program as entirely separate and independent matters. *See United States v. Ruedlinger,* No. 96–40045–01–SAC, 1997 WL 109974 (D.Kan. Feb. 24, 1997).

Based in large part upon the defendant's defense, that dichotomy between the LifeCat program and PIP program was not achieved. LifeCat represented a substantial revenue source for DRI. By repeatedly exploring the operation of DRI and its subsidiaries, Rued-

linger essentially opened the door to LifeCat references by both parties. *See United States v. Regents of New Mexico School of Mines,* 185 F.2d 389, 391 (10th Cir.1950) ("But it is also a rule of recognized judicial dignity that if a party interjects into a case incompetent evidence tending to establish immaterial or unrelated facts, he cannot complain on appeal that his adversary subsequently offered and was permitted to introduce the same kind of evidence. It is well established law that where one party opens a field of inquiry that is not competent or relevant to the issues in the case, he will not be heard to complain that his adversary was allowed to avail himself of the opening and introduce additional evidence pertinent to that field of inquiry even though under other circumstances the testimony would be inadmissible. A party, having himself opened the door to evidence which is inadmissible for the reason that it is not the proper method of establishing or resisting the issues in the case, cannot complain that thereafter the court in the exercise of its sound judicial discretion permitted the opposite party to introduce other testimony bearing upon that field of inquiry, even though under different circumstances the testimony would be subject to valid objection of inadmissibility."). Although the LifeCat program was frequently mentioned by both parties, the court repeatedly precluded the government from making any reference to DRI's financial abandonment of paralyzed student athletes during trial. Based upon the defendant's own inquiry into LifeCat, the government was entitled to enter through the door that was opened to explore that subject area, subject to the limitations placed upon it by the court.

■ In this same vein, Ruedlinger contends that the pendency of the indictment in the second case confronted him with a Hobson's choice regarding his defense in this case. During trial, defendant's counsel suggested that the government had placed him "in a box" in regard to his representation of

Ruedlinger as he did not know what was "out there" in the second case.

At this juncture the defendant has failed to articulate with any precision any prejudice that he suffered as a result of the pendency of the second case. Without concrete facts, any claim that his defense in this case was hampered is speculative. The court notes that the documentary materials used by the grand jury in the second case are ostensibly DRI's own records, records to which Ruedlinger presumably once personally had access. Without specific examples, the court is unable to properly evaluate this argument. Consequently, it serves as no basis for relief.

**Character Witnesses**

■ As mentioned above, Ruedlinger called character witnesses in his own defense. During cross-examination, the government asked several questions which explored each witness' basis of knowledge for their favorable opinions regarding Ruedlinger's character for honesty. In pertinent part, the following is an excerpt of the cross-examination of Brice Durbin:

Q. Did you hear or know that Mr. Ruedlinger was running a Ponzi scheme in order to make payments on all claims?

A. No.

Q. Did you hear or know that Mr. Ruedlinger entered into a consultant agreement with Wheatland Group Holdings for $50,000 a month, provided that he was not required to divulge a major or devote a major or substantial portion of his time to consulting?

A. No.

Q. Did you hear or know at the time you formed your opinion about Mr. Ruedlinger's character that on or about June 26 of 1992, Mr. Ruedlinger's attorney had informed him that prior reports to the FAA concerning reserves were incorrect, and that he should be candid with the board of directors of FAA?

A. I did not know that.

Q. Did you know or hear, in forming your opinion about Mr. Ruedlinger's character, that he instructed a member of his staff to

advise the association in the Virgin Islands that if they did not continue to do business with them their reserves would vanish?

A. No.

Q. Didn't know that?

A. Did you hear or know in forming your opinion about Mr. Ruedlinger's character that he cut off payments to a catastrophic—

MR. YERETSKY: Your Honor, may I approach the bench?

THE COURT: Yes.

Following a conference with the court, the government did not ask any additional questions about injured students during Durbin's cross-examination. The following limiting instruction was then read by the court to the jury:

On direct examination, Brice Durbin, a witness for the defendant, testified that he was familiar with the defendant's reputation for honesty, truthfulness and integrity. During the cross examination of this witness, the government has asked and may continue to ask questions of this witness as to whether this witness is aware of certain events or actions which have allegedly occurred in the past. I caution you that these questions by the government are only permitted for the purpose of test-

ing Brice Durbin's basis of knowledge for the opinions that he has offered.

Stated another way, the government is permitted to ask Brice Durbin or, for that matter, any other witness who testified about the defendant's reputation, [questions] which you may consider in deciding whether the witness is actually familiar with the defendant's reputation for honesty, truthfulness and integrity. The information developed by the government's attorney on that subject matter may not be used by you for any other purpose.

A similar instruction was included in the court's final instructions to the jury.[19] Following redirect, the government asked the following question:

Q. Have you ever heard of the—well, strike that. In forming your opinion about Mr. Ruedlinger's character for truthfulness and honesty, did you know or hear that Mr. Ruedlinger had cut off attendant care—

MR. YERETSKY: Your Honor, if we might approach. I'm not quite sure where this is going.

After a bench conference, the court sustained the defendant's objection to that question. During cross-examination of Bernie Saggau, another character witness, the government asked the following questions:

During the cross-examination of the witnesses called by the defendant to offer opinions about his reputation for truthfulness, honesty and integrity, the government asked those witnesses if they were aware of certain events or acts which have allegedly occurred in the past. As I instructed you during the trial, I again caution you that those questions by the government opinions that he offered. Stated another way, the government was permitted to ask witnesses who testified about the defendant's reputation questions which you may consider in deciding whether the witness is actually familiar with the defendant's reputation for honesty, truthfulness and integrity. The information developed by the government's attorney on that subject matter may not be used by you for any other purpose.

Instruction No. 26.

---

19. The instruction states:
 During this trial, some of the witnesses called by the defendant testified that they were familiar with the defendant's reputation for honesty, truthfulness and integrity. Where a defendant has offered evidence of good general reputation for truth and veracity, or honesty and integrity, or as a law-abiding citizen, the jury should consider such evidence along with all the other evidence in the case.
 Evidence of a defendant's reputation, inconsistent with those traits of character ordinarily involved in the commission of the crime charged, may give rise to a reasonable doubt, since the jury may think it improbable that a person of good character in respect to those traits would commit such a crime. The jury will always bear in mind, however, that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Q. Sir, did you know that in forming your opinion in regard to Mr. Ruedlinger's character for truth and veracity, that the national federation obtained a $1,000,000 judgment against Mr. Ruedlinger under the civil aspects of the Racketeer Influenced Corrupt Organization Act?

A. I did not know that.

Q. And that was in respect to his handling of the reserves?

A. The national federation has never reported that, to my knowledge.

Q. In forming your opinion about Mr. Ruedlinger's character, did you know or hear that Mr. Ruedlinger had entered into a consent settlement in a bankruptcy adversarial action in which he admitted to defalcations in respect to Wheatland Group Holdings?

A. No.

### Evidence of Character Offered by the Accused

■ "A major exception to the basic rule against proving conduct by evidence of character allows the defendant in a criminal case to introduce evidence of a pertinent trait of his character as circumstantial proof that he did not commit the charged crime." 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 101 at 544 (2d ed.1994). "Defendants not infrequently present evidence of good character, with the aim of encouraging the jury to draw the inference that it is unlikely that they committed the charged offense, and request an instruction from the court on the subject." *United States v. Daily*, 921 F.2d 994, 1010 (10th Cir.1990), *cert. denied*, 502 U.S. 952, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991). "The accused ... has an absolute right to introduce evidence of his or her good character. However, the trial court retains its traditional discretion to limit the scope of the proof, as by limiting the number of witnesses; the manner in which the proof is adduced; or by controlling the order of proof." 2 Jack B. Weinstein & Margaret A. Berger, *Wein-stein's Evidence* ¶ 404.04[1] (Joseph M. McLaughlin ed., 2d ed.1997); *see* 1 *Federal Evidence* § 101 at 547–548 ("A criminal defendant has essentially an absolute right to introduce evidence of a pertinent trait of his character during the defense case, although defendants need not be given the opportunity to make such a showing during the government's case in chief by cross-examining government witnesses.").

> [D]efendants should ordinarily be allowed to offer evidence of general good character, which has at least some tendency to suggest innocence in virtually every case and should serve to counter what seems the likely tendency of jurors to devalue the character of anyone accused of crime. Thus any defendant should be allowed to offer evidence that he is a law-abiding citizen or a person of good character.

*Id.* at 548. There is no requirement that the defendant testify before character evidence may be admitted. *See United States v. Smith*, 46 F.3d 1223, 1233 (1st Cir.) ("The government concedes that even if a criminal defendant does not testify, evidence of his truthfulness and veracity may be admitted where such character traits are 'pertinent' to the case."), *cert. denied*, —— U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995).

### Evidence for the Prosecution

"The prosecution may come forward with evidence rebutting good character only if the accused has called character witnesses to testify to his or her character, or when the defendant has 'opened the door' for such character testimony." 2 *Weinstein's Evidence* ¶ 404.04[2].

> When the defense introduce testimony describing good character or traits of character to show that the defendant did not do the acts or have the necessary intent (or to raise doubts on these issues), the prosecutor has two main lines of counterattack. One is to cross-examine defense witnesses on the defendant's past behavior. The other is to introduce testimony describing bad character or traits, thus rebutting the defense evidence and suggesting that the

defendant did commit acts or have the necessary intent.

1 *Federal Evidence* § 102.

### Cross-Examination of Opinion and Reputation Witnesses

"[A] reputation character witness can be asked on cross-examination whether he has heard about a certain event." *S.E.C. v. Peters,* 978 F.2d 1162, 1169 (10th Cir.1992). The same is true for "opinion" character witnesses:

> Prior to the adoption of Federal Rule of Evidence 405, opinion character evidence was not permitted to be introduced at all—only reputation character evidence was permitted. *See* Fed.R.Evid. 405, Advisory Committee Note ("In recognizing opinion as a means of proving character, the rule departs from usual contemporary practice ...") ; *United States v. Polsinelli,* 649 F.2d 793, 795 (10th Cir.1981). The drafters of the Rule noted that "reputation evidence is ... largely ... opinion in disguise." Fed.R.Evid. 405, Advisory Committee Note. Accordingly, Rule 405(a) dismantled the distinction between these two types of character evidence, providing that "proof may be made by testimony as to reputation or by testimony in the form of an opinion."

> Rule 405 clearly intends that opinion and reputation witnesses be treated similarly with respect to cross-examination. Rule 405(a) provides that "[o]n cross-examination, inquiry is allowable into specific instances of conduct." The Advisory Committee noted,

> > According to the great majority of cases, on cross-examination inquiry is allowable as to whether the reputation witness has heard of particular instances of conduct pertinent to the trait in question. *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Annot., 47 A.L.R.2d 1258. The theory is that, since the reputation witness relates what he has heard, the inquiry tends to

> shed light on the accuracy of his hearing and reporting. Accordingly, the opinion witness would be asked whether he knew, as well as whether he had heard. The fact is, of course, that these distinctions are of slight if any practical significance, and the second sentence of subdivision (a) eliminates them as a factor in formulating questions.

> Thus, Rule 405 does not preclude "have you heard" questions on cross-examination of opinion witnesses.

978 F.2d at 1169.

In *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the Supreme Court commented on the dangers of presenting good character witnesses:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

335 U.S. at 479, 69 S.Ct. at 220 (footnotes omitted).

## Analysis

Once the defendant affirmatively placed his character at issue, the government was entitled to explore each witness' basis of knowledge. The court sees no unfair prejudice from the scope of the government's inquiry. No questions regarding the most damaging aspects of the LifeCat evidence—abandonment of paralyzed student athletes—were answered.[20] Based upon the limited number of "did you know" questions and the court's limiting instructions, coupled with the assumption that jurors can and will follow the instructions they are given, *see United States v. Rodriguez–Aguirre*, 108 F.3d 1228, 1237 (10th Cir.1997) ("The assumption that juries can and will follow the instructions provided by the trial court 'is fundamental to our system of justice.' ") (quoting *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir.1989), *petition for cert. filed on* June 9, 1997, no error was committed). *See Leeseberg*, 767 F.Supp. at 1097–98 (no error in permitting government to ask character witnesses about pending civil suits against defendant).

## Evidence of Civil Proceedings

██ During trial, the government was permitted to introduce evidence that former members of FAA had obtained civil judgments against both DRI and/or Ruedlinger personally. *See* Government's Exhibits ## 74 and 81. Several witnesses were asked questions about those civil judgments. As he did at trial, Ruedlinger again objects to the court's admission of those exhibits and to the numerous references to civil proceedings throughout the trial.

Prior to admitting evidence pertaining to civil proceedings, the court reviewed a number of cases discussing the issue. In *United States v. Cohen*, 946 F.2d 430 (6th Cir.1991), the defendant argued that the district court erred in admitting into evidence a consent judgment from the companion civil copyright

infringement suit. On appeal, the Sixth Circuit found no abuse of discretion in admitting the consent judgment:

> Although he suggests that civil judgments are generally inadmissible as evidence in criminal cases, other circuits have admitted consent judgments into evidence in criminal trials under Federal Rule of Evidence 404(b) and its common law predecessor. *See United States v. Serian*, 895 F.2d 432 (8th Cir.1990); *United States v. Parker*, 839 F.2d 1473 (11th Cir.1988); *United States v. Gilbert*, 668 F.2d 94 (2d Cir.), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. King*, 505 F.2d 602 (5th Cir.1974); *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir.1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). Here the consent judgment does not refer to a "prior act" countenanced by Rule 404(b), but it is relevant, not overly prejudicial and was accompanied by a limiting instruction which explained the different burdens of proof in civil and criminal matters. Although one commentator notes that admitting prior civil judgments into evidence in subsequent criminal trials may violate a defendant's right of confrontation, *McCormick on Evidence*, § 318 (1984 ed.), we think that Cohen's consent judgment can be characterized better as a personal admission properly admitted under Federal Rule of Evidence 801(d)(2)(A) than as a civil judgment resulting from a jury or bench verdict. The question of burdens of proof never arose, and only Cohen's consent made the judgment conclusive. We have held elsewhere that it is a "familiar rule of evidence that any statement by a party may be offered against him by his opponent," and here Cohen agreed to be enjoined permanently from infringing the plaintiffs' copyrights. *United States v. Slone*, 833 F.2d 595, 601 (6th Cir.1987). *See also* 2 C. Wright, *Federal Practice and*

---

**20.** The jury was instructed that "[t]he question of a lawyer is not to be considered by you as evidence. It is the witnesses' answers that are evidence, not the questions." Jury Instruction # 33.

*Procedure* § 413 (1982). The consent judgment is analogous to testimony in a prior civil proceeding, and the admissibility of such testimony in criminal trials is well-settled. *See United States v. White*, 589 F.2d 1283 (5th Cir.1979); *United States v. Vecchiarello*, 569 F.2d 656 (D.C.Cir.1977) *United States v. Anderson*, 481 F.2d 685 (4th Cir.1973), *aff'd*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *United States v. Cecil*, 457 F.2d 1178 (8th Cir.1972); *Hale v. United States*, 406 F.2d 476 (10th Cir.), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2129, 23 L.Ed.2d 765 (1969). Thus, even if we cannot characterize the consent judgment as a "judicial admission" which would eliminate the further need for evidence on the subject matter of the admission because the admitted facts are no longer at issue, the consent judgment offers probative evidence admissible under Rule 801(d)(2)(A). *See Ferguson v. Neighborhood Housing Services*, 780 F.2d 549 (6th Cir.1986).

Cohen argues that admission of the consent judgment was overly prejudicial to him, but we disagree. The evidence was clearly probative, and the District Court provided a specific limiting instruction to the jury with regard to the consent judgment. Our standard of review in determinations of this sort is "abuse of discretion," and the District Court did not abuse its discretion here. *United States v. Vance*, 871 F.2d 572 (6th Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989).

946 F.2d at 435 (footnotes omitted)

The court believes that evidence of other civil proceedings against Ruedlinger and DRI was properly admitted. To an extent, Ruedlinger's own inquiry opened the door to this evidence. Evidence of other civil proceedings was not only relevant in a general sense, such as for the purpose of possibly explaining and/or exploring the motives of certain government witnesses, but also because some of the documents related to those proceedings contained express admissions by Ruedlinger that he was personally liable for defalcation of Wheatland Group Holdings, Inc.'s assets. *See* Government's Exhibit #81 at 4 ("21. Douglas O. Ruedlinger is indebted to the estate for $700,000 for defalcation while acting as a fiduciary (as those terms are used in 11 U.S.C. § 523(a)(4)) of Wheatland. The [Bankruptcy] Court makes no finding that the defalcation was, or was not, fraudulent."). This evidence was obviously relevant to rebut Ruedlinger's "legitimate business operation" defense, the nucleus of his case.

In any event, the impact of any evidence regarding civil proceedings was minimized by the inclusion of the following limiting instruction contained in the court's final jury instructions:

During this case you have heard several references to civil proceedings in other courts, including proceedings in bankruptcy court. Your sole responsibility in this case is to determine whether or not the government has proven the defendant, Douglas O. Ruedlinger, guilty of the crimes charged in second superseding indictment. As we discussed in voir dire, a criminal proceeding such as this one in which you are sitting as jurors differs in several significant ways from a civil proceeding. Two of the most important distinctions between a criminal and civil case are the different burdens of proof and the presumption of innocence.

In a criminal case the government bears the burden of proving the defendant guilty of the crime charged beyond a reasonable doubt. In contrast, in a civil case the party seeking relief, called the plaintiff, has the burden of proving its claim against the defendant by only a preponderance, or greater weight of the evidence. In a criminal case the defendant is presumed innocent. In a civil case, the defendant enjoys no such presumption of innocence. In considering any testimony or documents referring to civil proceedings, including bankruptcy proceedings, it is important for you to keep these significant distinctions in mind.

Some of the civil proceedings referred to during this trial were resolved upon the mutual agreement of the parties, often referred to as disposition by settlement. Settlement of civil disputes upon the mutually agreed terms of the parties is encouraged by the courts. A party to a lawsuit may agree to settle a claim against them because they concede that they are civilly liable, and the settlement agreement may state that admission of liability expressly. However, a party to a lawsuit may agree to settle a dispute without admitting liability to the claims asserted against them. In deciding whether or not to settle a civil lawsuit by mutual agreement, parties routinely consider the potential risks, benefits, costs and other considerations in determining whether to proceed to trial.

Jury Instruction No. 31. The jury was also instructed that Ruedlinger "is on trial only for the acts alleged in the second superseding indictment. He is not on trial for any other acts or conduct." Jury Instruction No. 3. Admission of evidence of civil proceedings against DRI and Ruedlinger was not error.

### Government Exhibit # 84

 During cross-examination of Steve Clinkinbeard regarding BCC's audit of FAA, the government was initially permitted to ask questions about an exhibit designated as Government Exhibit # 84. The government moved for the admission of the exhibit. The court granted Ruedlinger's counsel's request to ask Clinkinbeard several foundational questions regarding the exhibit. Upon completion of that examination, defendant's counsel stated "[n]o objection" and the document was received into evidence. Based upon subsequent answers of the witness indicating that Government Exhibit # 84 was not related to the BCC audit, the government sought and was granted permission to withdraw the exhibit. The defendant requested the court

to admonish the jury regarding Government Exhibit # 84. Based upon that request, the court instructed the jury as follows:

> Members of the jury, as to exhibit number 84, the last exhibit, the one which is (sic) appears on the screen, I instruct you to disregard it, pay no attention to it whatsoever, it is not part of your deliberations and it's not a part of this case.

Trial Transcript at 669.

In his motion for new trial, Ruedlinger contends that he was unfairly prejudiced by the government's use of Exhibit 84 during cross-examination. As the government suggests, Ruedlinger was not prejudiced by the examination, introduction and withdrawal of that exhibit. The exhibit was initially received without objection. The defendant requested and received a specific instruction regarding the fact that the exhibit was not evidence which the jury could consider in its deliberations.[21] In light of the substantial mass of evidence against Ruedlinger, and in view of the court's instructions, this relatively minor detour did not prejudice him or deprive him of his right to a fair trial.

### Previous Written Orders

In the closing portion of his motion for judgment of acquittal and/or new trial, the defendant reasserts and incorporates by reference all of his pretrial motions. The court believes its rulings on those motions were correctly decided and will not revisit them again.

### Final Observations

While the defendant complains that he did not receive a fair trial, nothing he identifies convinces the court that the jury's verdict was based upon anything but a reasonable application of the facts to the controlling law. Although this order has not explicitly discussed each and every point made by the defendant during trial or in his motion for judgment of acquittal and/or new trial, the court has considered each of the defendant's

---

**21.** The court's final instructions to the jury included the following admonishment:

Any evidence as to which an objection was sustained by the court, and any evidence or-

dered stricken by the court, must be entirely disregarded.
Jury Instruction No. 33.

objections and concludes that no errors necessitating a new trial were committed. This lengthy memorandum and order simply addresses the defendant's most salient arguments.

In lodging his objections, the defendant fails to note that he was given wide berth in the presentation of evidence regarding the operation of his insurance business. Over the government's objection, the court permitted the defendant to introduce substantial evidence regarding the ostensibly legitimate manner in which he operated his business. In permitting the defendant to introduce this evidence, the court acknowledges the Tenth Circuit's decision in *Kennedy*, 64 F.3d 1465. In *Kennedy*, the defendant argued that the district court had committed reversible error by excluding evidence of completed transactions to individual investors. The defendant contended that such evidence was relevant to his defense that his business was legitimate and that the other investors' losses were caused by mismanagement rather than an intentionally fraudulent Ponzi scheme. The Tenth Circuit found no plain error in the district court's decision to exclude evidence offered by the defendant that many persons had completed transactions to individual investors who did not suffer losses as a result of his business.

During trial, the court believed that Ruedlinger's case was distinguishable from *Kennedy*, in several respects. First, unlike the defendant in *Kennedy*, Ruedlinger's counsel made it repeatedly clear that evidence regarding the legitimate manner in which his client conducted business was central to his defense, *i.e.*, that Ruedlinger did not ever knowingly engage in a scheme to defraud. Second, the second superseding indictment in this case alleged that Ruedlinger operated his scheme to defraud/Ponzi scheme between 1984 and 1993. At its core, the second superseding indictment challenged the legitimacy of Ruedlinger's business operations.[22] In light of the breadth of the description of the scheme to defraud contained within the second superseding indictment, the court still believes that the defendant was entitled, subject to the limitations of Fed.R.Evid. 401–403, to introduce evidence supporting his defense that he conducted his business enterprises in a legitimate manner.

In summary, the defendant's convictions are amply supported by the evidence. No error warranting a new trial was committed. To attribute blame for his convictions the defendant need look no further than his own cavalier attitude regarding the spending of other persons' money for his own personal benefit. In short, Ruedlinger's insatiable need for money caused his fall from the position of respected entrepreneur and member of the community.

IT IS THEREFORE ORDERED that Ruedlinger's "Motion for Judgment of Acquittal and/or New Trial" (Dk. 127) is denied.

### Attachment

### VERDICT

We, the jury, duly impaneled and sworn, hereby answer the following questions propounded by the court:

1. Counts 1 through 10 of the second superseding indictment charge Douglas O. Ruedlinger with voluntarily and intentionally devising or participating in a scheme and artifice to defraud and using the United States mails in furtherance of the scheme and artifice, a crime commonly referred to as "mail fraud."

Do you find the defendant, Douglas O. Ruedlinger, not guilty or guilty as to the following counts set forth in the second superseding indictment?

Count 1

(Check one) Not Guilty ⎯⎯⎯⎯⎯

---

22. In general, one typical characteristic of a Ponzi scheme is its short term duration. The fact that Ruedlinger was able to keep the scheme afloat as long as he did can be attributed in part to his financial machinations (multiple corporate structure, borrowing money from multiple sources and leveraging property to the hilt) and the fact that DRI did in fact have substantial legitimate sources of income.

 

Guilty X Guilty X ·

Count 2

(Check one) Not Guilty _____

Guilty X

Count 3

(Check one) Not Guilty _____

Guilty X

Count 4

(Check one) Not Guilty _____

Guilty X

Count 5

(Check one) Not Guilty _____

Guilty X

Count 6

(Check one) Not Guilty _____

Guilty X

Count 7

(Check one) Not Guilty _____

Guilty X

Count 8

(Check one) Not Guilty _____

Guilty X

Count 9

(Check one) Not Guilty _____

Guilty X

Count 10

(Check one) Not Guilty _____

2. Counts 11 and 12 of the second superseding indictment charge Douglas O. Ruedlinger with voluntarily and intentionally devising or participating in a scheme and artifice to defraud and using interstate wire facilities in furtherance of the scheme and artifice, a crime commonly referred to as "wire fraud."

Do you find the defendant, Douglas O. Ruedlinger, not guilty or guilty as to the following counts set forth in the second superseding indictment?

Count 11

(Check one) Not Guilty _____

Guilty X

Count 12

(Check one) Not Guilty _____

Guilty X

If you have found the defendant guilty of any of the crimes charged in Counts 1 through 12, which of the following false representations or promises do you unanimously find were used by the defendant to defraud state high school associations out of money or property? (check all applicable)

_____ that **RUEDLINGER** represented or caused to be represented to participating state school activities associations that the balance of annual ·deposits, submitted by member associations, would be held in reserves and invested in money market instruments, with all interest credited to the associations' reserve accounts on a pro rata basis.

_____ that **RUEDLINGER** caused annual deposits of state school activities associations, to be commingled with operating funds and monies of all **RUEDLINGER** operations, and used for his own personal use and benefit, including, but not limited to: the payment of operating expenses of all **RUEDLINGER** companies; **RUEDLINGER'S** annual salary of $600,000 to $1,400,000; and, acquisition, improvement and maintenance

of a jet airplane, a horse farm in Florida, condominiums in Florida and Vermont, and a residence in Florida appraised in excess of $2,000,000.00.

_____ that **RUEDLINGER** would prepare, or cause to be prepared, spreadsheets that were presented annually to members of the board of FAA which falsely represented that there were positive reserve accounts for most member associations, when in truth and in fact as **RUEDLINGER** well knew, no such funded reserves existed.

_____ that **RUEDLINGER** would use, or cause to be used, the United States Mail to send to member associations, Reserve Statements, that would falsely represent to most member associations that they had positive reserve balances on account, and that interest had been credited to these reserves, when in truth and in fact as **RUEDLINGER** well knew, no funded reserves existed, and therefore no interest had been earned.

_____ that **RUEDLINGER** would use the mail and interstate telephone communications, to falsely represent to FAA members, and their lawful representatives, that the reserve balances were growing, and that reserve balances were in banks, but that he could not disclose the whereabouts of the banks, because of pending litigation; when in truth and in fact, as **RUEDLINGER** well knew, no funded reserves existed.

_____ that **RUEDLINGER** falsely represented to the board of FAA, Inc., that he would provide to them a "certified bank statement" at their July 1992 meeting, showing that the reserve balances were in banks, when in truth and in fact as the defendant well knew, he intended to dissolve FAA prior to the meeting.

_____ that **RUEDLINGER,** as part of an effort to conceal the fact that reserves did not exist, and make the

PIP program appear to be operating as promised, operated or caused to be operated a "Ponzi" scheme, where claims and obligations for PIP were paid out of incoming premiums of FAA members, as well as other insurance products sold by **RUEDLINGER**.

3. Counts 13 through 17 of the second superseding indictment charge Douglas O. Ruedlinger with engaging in monetary transactions in property derived from certain specified unlawful activities including mail fraud and wire fraud, a crime commonly referred to as "money laundering."

Do you find the defendant, Douglas O. Ruedlinger, not guilty or guilty as to the following counts set forth in the second superseding indictment?

Count 13

(Check one) Not Guilty X
 Guilty _____

Count 14

(Check one) Not Guilty X
 Guilty _____

Count 15

(Check one) Not Guilty X
 Guilty _____

Count 16

(Check one) Not Guilty X
 Guilty _____

Count 17

(Check one) Not Guilty _____
 Guilty X

4/7/97 Carroll F. Schubert
Date Foreperson

## INSTRUCTION NO. 10

Title 18, United States Code § 1341 makes it a federal crime to voluntarily and inten-

tionally devise or participate in a scheme and artifice to defraud and to use the United States mails in furtherance of the scheme and artifice. This crime is commonly referred to as "mail fraud."

Counts 1–10 charge the defendant with ten separate counts of mail fraud. For you to find the defendant guilty of the crime of mail fraud as charged in Counts 1–10 of the second superseding indictment, the government must prove each of the following four essential elements beyond a reasonable doubt:

*FIRST:* That on or about the date alleged in that count, the defendant voluntarily and intentionally devised and/or participated in a scheme and artifice to defraud state high school activities associations out of money or property by means of false representations or promises, with all of you agreeing on at least one particular false representation or promise that was made, which scheme and artifice is charged in the second superseding indictment,

*SECOND:* That the defendant did so with the intent to defraud;

*THIRD:* That it was reasonably foreseeable that the United States mails would be used; and

*FOURTH:* That the United States mails were used in furtherance of some essential step in the scheme and artifice.

Under the mail fraud statute each separate use of the mails in furtherance of the scheme and artifice to defraud constitutes a separate offense.

Before you can find that the government has proven the defendant guilty of the crime of mail fraud, you must unanimously agree on one of the following theories: that the government has proven beyond a reasonable doubt that the defendant (1) "devised" or (2) "participated in" or (3) "devised" *and* "participated in" a scheme and artifice to defraud state high school activities associations out of money or property by means of false representations or promises.

A scheme and artifice to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension. The phrase "scheme and artifice to defraud" includes any plan or course of action intended to deceive or cheat another out of money or property from another by means of false representations or promises.

A statement or representation is "false" when it is untrue when made or effectively conceals a material fact. A material fact is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction.

To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property to another or bringing about some financial gain to oneself or another to the detriment of a third party. With respect to false statements the defendant must have known the statement was untrue when made or have made the statement with reckless indifference to its truth or falsity. It is not necessary that the use of the mails by the participants themselves be contemplated or that the defendant do any actual mailing or specifically intend that the mails be used. It is sufficient if the mails were in fact used to carry out the scheme and artifice and the use of the mails by someone was reasonably foreseeable.

It is not necessary for the government to prove that the item itself mailed was false or fraudulent or contained any false or fraudulent statement, representation, or promise, or contained any request for money or property. The government must prove beyond a reasonable doubt, however, that the use of the mails furthered, advanced or carried out, in some way the scheme and artifice to defraud state high school activities associations out of money or property by means of false representations or promises as charged in the second superseding indictment. Mailings which are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme and artifice.

It is not necessary that the government prove all of the details alleged in the second superseding indictment concerning the precise nature and purpose of the scheme and artifice or that the alleged scheme and arti-

fice actually succeeded in defrauding anyone. Nor is it necessary for the government to prove that the use of the mail was intended as the specific or exclusive means of accomplishing the alleged fraud. However, you must unanimously agree that the government has proven beyond a reasonable doubt that the defendant knowingly devised or participated in a scheme and artifice to defraud that was substantially the same as the one alleged in the second superseding indictment before you can find the defendant guilty of mail fraud.

An act is done knowingly if done voluntarily and purposefully, and not because of mistake or inadvertence or other innocent reason.

### INSTRUCTION NO. 11

Title 18, United States Code § 1343 makes it a federal crime to voluntarily and intentionally devise or participate in a scheme and artifice to defraud and to use interstate wire facilities in furtherance of the scheme and artifice. This crime is commonly referred to as "wire fraud."

Counts 11 and 12 charge the defendant with two separate counts of wire fraud. The elements of 18 U.S.C. § 1343, wire fraud, are virtually identical to the elements of 18 U.S.C. § 1341, mail fraud, with one exception: the government must prove that the defendant caused interstate wire communication facilities to be used instead of the United States mail.

For you to find the defendant guilty of the crime of wire fraud as charged in Counts 11–12 of the second superseding indictment, the government must prove each of the following four essential elements beyond a reasonable doubt:

*FIRST:* That on or about the date alleged in that count, the defendant voluntarily and intentionally devised and/or participated in a scheme and artifice to defraud state high school activities associations out of money or property by means of false representations or promises, with all of you agreeing on at least one particular false representation or promise that was made, which scheme and

artifice is charged in the second superseding indictment,

*SECOND:* That the defendant did so with the intent to defraud;

*THIRD:* That it was reasonably foreseeable that interstate wire communication facilities would be used; and

*FOURTH:* That the interstate wire communication facilities were used in furtherance of some essential step in the scheme and artifice.

Under the wire fraud statute each separate use of the interstate wire communication facilities in furtherance of the scheme and artifice to defraud constitutes a separate offense.

Before you can find that the government has proven the defendant guilty of the crime of wire fraud, you must unanimously agree on one of the following theories: that the government has proven beyond a reasonable doubt that the defendant (1) "devised" or (2) "participated in" or (3) "devised" *and* "participated in" a scheme and artifice to defraud state high school activities associations out of money or property by means of false representations or promises.

A scheme and artifice to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension. The phrase "scheme and artifice to defraud" includes any plan or course of action intended to deceive or cheat another out of money or property from another by means of false representations or promises.

A statement or representation is "false" when it is untrue when made or effectively conceals a material fact. A material fact is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction.

To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property to another or bringing about some financial gain to oneself or another to the detriment of a third party. With respect to false statements the defendant must have known the statement was untrue when made or have made the

statement with reckless indifference to its truth or falsity. The phrase "interstate wire communications facilities" includes a telephone conversation by a person in one state with a person in another state.

It is not necessary that the use of the interstate wire communication facilities by the participants themselves be contemplated or that the defendant actually use such facilities or that the defendant specifically intend that the facilities be used. It is sufficient if the interstate wire communication facilities were in fact used to carry out the scheme and artifice and the use of the interstate wire communication facilities by someone was reasonably foreseeable.

It is not necessary for the government to prove that the interstate telephone conversation itself was false or fraudulent or contained any false or fraudulent statement, representation, or promise, or contained any request for money or property. The government must prove beyond a reasonable doubt, however, that the use of the interstate wire communication facilities furthered, advanced or carried out, in some way the scheme and artifice to defraud state high school activities associations out of money or property by means of false representations or promises as charged in the second superseding indictment. An interstate telephone conversation designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect is a use of interstate wire communication facilities in furtherance of the scheme and artifice to defraud.

It is not necessary that the Government prove all of the details alleged in the second superseding indictment concerning the precise nature and purpose of the scheme and artifice or that the alleged scheme and artifice actually succeeded in defrauding anyone. Nor is it necessary for the government to prove that the interstate use of the telephone was intended as the specific or exclusive means of accomplishing the alleged fraud. However, you must unanimously agree that the government has proven beyond a reasonable doubt that the defendant knowingly devised or participated in a scheme and artifice

to defraud that was substantially the same as the one alleged in the second superseding indictment before you can find the defendant guilty of wire fraud.

An act is done knowingly if done voluntarily and purposefully, and not because of mistake or inadvertence or other innocent reason.